1

```
 1              IN THE UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF ARKANSAS
 2                     WESTERN DIVISION

 3

 4  UNITED STATES OF AMERICA,     .
                                  . Docket No. 4:15-CR-00095-1 KGB
 5  PLAINTIFF,                     .
                                  . Little Rock, Arkansas
 6  VS.                            . September 30, 2015
                                  . 2:10 P.M.
 7  TERENCE GORDON,                .
                                  .
 8  DEFENDANT.                     .
     . . . . . . . . . . . . . . .
 9

10

11                       TRANSCRIPT OF

12                    DETENTION HEARING

13         BEFORE THE HONORABLE PATRICIA S. HARRIS

14              UNITED STATES MAGISTRATE JUDGE

15

16

17

18  ELECTRONIC COURT RECORDER-OPERATOR:  Ms. Colleen DuBose

19

20  Transcription Service:           Robin Warbritton
                                     Post Office Box 262
21                                   Vilonia, AR  72173

22

23

24  PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING.

25  TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.
```

```
1   APPEARANCES:

2   For the Government:      Ms. Angela S. Jegley
                             U.S. Attorney's Office
3                            Eastern District of Arkansas
                             Post Office Box 1229
4                            Little Rock, AR  72203-1229

5   For the Defendant:       Ms. Molly K. Sullivan
                             Federal Public Defenders Office
6                            The Victory Building
                             1401 West Capitol Avenue
7                            Suite 490
                             Little Rock, AR  72201
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1                            I N D E X

2                    DIRECT    CROSS    REDIRECT    RECROSS

3  GOVERNMENT'S WITNESS:

4  Alison Scifres          13        21

5

6  DEFENDANT'S WITNESS:

7  Ms. Gordon              22        26

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

P R O C E E D I N G S

1

2     (Call to order of the Court at 2:10 p.m.)

3          THE COURT:  Good afternoon.

4          We are here today in the case of *United States v.*

5  *Terence Gordon*, case number 4:15-CR-95-1-KGB.

6          Mr. Gordon is here today with his attorney, Molly

7  Sullivan, who I can't see, but I know she's here.

8          The United States is represented by Angela Jegley.

9          I understand that Mr. Gordon was indicted on May 16th

10 of this year and charged with being a felon in possession of a

11 firearm.  His initial appearance and plea and arraignment took

12 place on May 28th of 2015, and an order to lodge a detainer

13 was issued on that date because Mr. Gordon was in state

14 custody in Mississippi County at that time.

15          I understand that, despite the detainer, that Mr.

16 Gordon was released from state custody and went to Iowa for a

17 period of time.  He has turned himself in today to the

18 Marshals Service.  And we are here today to determine if he

19 should be released pending his federal trial.

20          Am I correct on that?

21          MS. SULLIVAN:  Correct, Your Honor.

22          MS. JEGLEY:  It is, Your Honor.

23          THE COURT:  Okay.  Thank you.

24          I understand that the parties have come to terms

25 about the terms of a release for Mr. Gordon; is that correct?

5

1          MS. JEGLEY:   It is.

2          THE COURT:   Okay.  Ms. Jegley, will you state the

3    terms of that agreement?

4          MS. JEGLEY:   I will, Your Honor.  We've -- in light

5    of Mr. Gordon's pending state charges and due to the nature of

6    those charges, in addition to the nature of the charges that

7    are pending against him in federal court, we have agreed that

8    Mr. Gordon should continue to live with his father in the

9    state of Iowa, and that he will be subject to electronic

10   monitoring.  We understand that he has a full time job.  And

11   we would recommend to the Court, that in addition to those

12   other conditions, that he maintain employment.

13          The one thing that I think we didn't talk about,

14   because this -- the facts here kind of caught both me and Ms.

15   Sullivan short, about his having been in Iowa, was when the

16   Court would be requiring him to return to Iowa, or, in other

17   words, what happens between today and whenever the electronic

18   monitoring is put in place?  Because I -- I'm sure that

19   Probation is going to want to know where he is so that they

20   could supervise him.

21          So, that was the one thing that we didn't discuss.

22   And I understand that Mr. Gordon drove all night from Iowa to

23   get here today.

24          And other than that, then the standard conditions for

25   OR bond.

1    THE COURT:  Ms. Sullivan, did Ms. Jegley state the

2 terms correctly?  And if so, can you comment on the issue of

3 when he will be going back to Iowa?

4    MS. SULLIVAN:  He is actually -- as soon as -- if he

5 gets released today, he's going to be driving back to Iowa.

6 He has to be back at work tomorrow.

7    THE COURT:  Okay.  All right.  Thank you.

8    I'm going to agree that the recommendation is

9 appropriate, and allow Mr. Gordon to be released with the

10 following conditions of release.

11    Mr. Gordon, I need -- I need you to be sure to

12 understand these conditions of release and that if you violate

13 these conditions you will be held to some consequences.

14    It will be helpful if you guys could come up here to

15 the podium while I describe these for you.

16    Mr. Gordon, while you are in Iowa, you'll be living

17 with your father, correct?

18    THE DEFENDANT:  [No audible response.]

19    THE COURT:  All right.  And you are employed,

20 correct?

21    THE DEFENDANT:  [No audible response.]

22    THE COURT:  All right.  I want -- I'm going to

23 require you to be on electronic monitoring and you will --

24 your whereabouts will be able to be monitored by the Probation

25 Office in Iowa.  Okay?  Do you understand?

1        THE DEFENDANT:  [No audible response.]

2        THE COURT:  Okay.  You need to respond --

3        THE DEFENDANT:  Yes.

4        THE COURT:  -- verbally.  Okay.  Thank you.

5        Here are the conditions of release I'm going to set:

6        You are -- you must not violate any federal, state,

7   or local laws while you're on pretrial release.

8        You must -- you must cooperate in the collection of a

9   DNA sample.

10        You must advise the Court or your Pretrial Service

11   Officer, in writing, if you change your address or telephone

12   number.  The Pretrial Service Office in Iowa will have someone

13   who is going to be responsible for supervising you.  And if

14   you change your address or your phone number, they're not

15   going to be able to find you, and then we will have some

16   problems related to that.  Do you understand?

17        THE DEFENDANT:  [No audible response.]

18        THE COURT:  Okay.  You must appear in court when

19   you're ordered to do so.  And you must surrender if you are

20   directed to serve a sentence at the conclusion of this case.

21        I'm going to ask you to sign a bond that sets forth

22   all of these conditions when we finish up here today.  So

23   you're going to be required to sign your bond papers.  Okay?

24        THE DEFENDANT:  [No audible response.]

25        THE COURT:  You are -- let's see -- you must submit

1   and report for supervision, when you return to Iowa, directly.

2          Can you tell me a little bit about how that works?

3          MS. SCIFRES:  Once he is released today, if he'll

4   come upstairs, I can give him further instructions.

5          THE COURT:  Very good.

6          MS. SCIFRES:  The location monitoring, is he going to

7   have a curfew or --

8          THE COURT:  I want him to work.  And I'm going to

9   give him a curfew.

10         What are your normal working hours?

11         THE DEFENDANT:  They -- they vary, because like right

12  now we're in the process of trying to run like two shifts.

13  So, right now, I'm working on first, and that's from 6:00 to

14  anywhere from 4:00 to 5:00.  But I know when they start

15  running like they want to, I'll probably be working second,

16  and that's like 12 hour days.

17         THE COURT:  Okay.  Here's what I think I'll do then,

18  under those circumstances, I'll -- I'll give you home

19  detention and on electronic monitoring.  You will be allowed

20  to leave your home to go to work and to go to church, and

21  anything other than that, you're going to need to get

22  permission from your Probation Officer.  Okay?  Do you

23  understand?

24         THE DEFENDANT:  [No audible response.]

25         THE COURT:  Is that a yes?  Okay.

1    So you need to report to Probation right after this

2  hearing and get instructions on how to make connection with

3  the U.S. Probation Office in Iowa, where you're going to be.

4  Okay?

5    THE DEFENDANT:  [No audible response.]

6    THE COURT:  They will arrange for you to get the

7  electronic monitor.

8    I need you to continue with your employment.  If you

9  lose that job for any reason, I need you to find other

10 employment.  Okay?

11   THE DEFENDANT:  [No audible response.]

12   THE COURT:  I need you to not use alcohol

13 excessively.

14   I need you -- you are not allowed to possess a

15 firearm.  And you understand that --

16   THE DEFENDANT:  Yes.

17   THE COURT:  -- correct?

18   All right.  You may not possess a narcotic drug or

19 any other controlled substance unless prescribed by a

20 physician.

21   You must submit to drug testing if required by the

22 Probation Office in Iowa.  Okay?

23   THE DEFENDANT:  [No audible response.]

24   THE COURT:  You may also be required to participate

25 in drug treatment if it's found to be necessary by the

1  Probation Officer to whom you're assigned.

2          I'm going to check home detention here, with

3  electronic monitoring.

4          You must report, as soon as possible, to your

5  Pretrial Services Officer any contact that you have with law

6  enforcement.  If you get a speeding ticket, you need to let

7  your Probation Officer know about it.  If you get a ticket for

8  loitering, or if you just get stopped for any reason, you need

9  to let your Probation Officer know.  You won't get in trouble

10 if you get a speeding ticket.  What will get you in trouble is

11 if you get stopped and have contact with law enforcement and

12 don't tell your Probation Officer.  Do you understand?

13         THE DEFENDANT:  [No audible response.]

14         THE COURT:  Okay.  You must make regular contact with

15 Ms. Sullivan, and that's at least every two weeks you need to

16 be in contact with her about your case.  Okay?

17         THE DEFENDANT:  [No audible response.]

18         THE COURT:  Do you understand those conditions?

19         THE DEFENDANT:  [No audible response.]

20         THE COURT:  Okay.  I need to advise you of

21 consequences, penalties, for failing to comply with these

22 conditions.  Okay?

23         THE DEFENDANT:  [No audible response.]

24         THE COURT:  There are consequences if you -- if you

25 do not comply.  If you fail to comply and the United States

1 Attorney's Office files a petition to revoke you, a warrant

2 can be issued for your arrest.  You could be arrested and

3 transported here.  I could revoke your release.  I could put

4 you in jail until the time of your trial.  I believe that's in

5 January.  So you -- you could be in jail until the time of

6 your trial if you don't comply with these conditions.

7           If you commit a felony while you're on supervision or

8 on release, that could be an additional prison term of not

9 more than ten years.  If -- and that will be consecutive to

10 any term you might receive in this case.

11           If -- let's see -- if you fail to appear after I

12 release you, you can be prosecuted for that and additional

13 punishment can be imposed.  And that punishment would also be

14 consecutive to any sentence you might receive in this case.

15           Do you understand?

16           THE DEFENDANT:  [No audible response.]

17           THE COURT:  Okay.  What I'm going to do is ask my

18 Courtroom Deputy then to provide these bond papers to you and

19 ask you to review and sign them, please.

20           THE COURTROOM DEPUTY:  That's your copy.

21           MS. SULLIVAN:  Okay.  Thank you.

22           THE COURT:  And I have to tell you, Ms. DuBose, I

23 didn't sign that.  I'm sorry.  Grab his and bring it back to

24 me and I'll sign -- I'll sign it.  I apologize.

25           Thank you.  Okay.  Sorry about that.

1       Okay.  Mr. Gordon, you're going to be receiving

2  copies of your bond papers.  You're going to be released from

3  the Marshals Service.  And I need you to go meet with

4  Probation.  And head back to Iowa and keep your nose clean.

5       Are there any other matters we need to take up at

6  this time?

7       MS. SULLIVAN:  No, Your Honor.

8       MS. JEGLEY:  No.  Thank you.

9       THE COURT:  Okay.  Thank you.  The Court is in

10  recess.

11    (Recess at 2:24 p.m.)

12                    AFTER RECESS

13    (Call to order of the Court at 4:01 p.m.)

14       THE COURT:  Good afternoon.

15       MS. JEGLEY:  Good afternoon.

16       MS. SULLIVAN:  Good afternoon.

17       THE COURT:  This is the case of *United States v.*

18  *Terence Gordon*, case number 4:15-CR-95-1-KGB.

19       We were here earlier today on a detention hearing

20  with regard to Mr. Gordon.  And at that time, based on

21  representations that were made to the Court that Mr. Gordon

22  was living with his father in Iowa, the Court agreed to

23  release him to return to Iowa to continue living with his

24  father with electronic monitoring and supervision there.

25       The United States has been informed that -- that Mr.

Scifres - Direct                                         13

1  Gordon may not, in fact, be living with his father.

2           Ms. Jegley, would you like to address the issues that

3  have arisen since the case was concluded just a little bit

4  ago?

5           MS. JEGLEY:  I would, Your Honor.  Thank you.

6           And my -- and I'm -- I think the easiest thing to do

7  is to go ahead and advise the Court that based upon the

8  information that has been given to me by the Probation Office,

9  I am now requesting that Mr. Gordon be detained pending trial,

10 based upon not only lies that were told to the Court directly,

11 but also by omission.  And I -- I think perhaps the cleanest

12 way to do that is go ahead -- to go ahead and call Ms. Scifres

13 to testify, if I may.

14          THE COURT:  You may.

15      ALISON SCIFRES, GOVERNMENT'S WITNESS, SWORN.

16                       DIRECT EXAMINATION

17 BY MS. JEGLEY:

18 Q   Would you please state your name?

19 A   It's Alison Scifres.

20 Q   And, Ms. Scifres, who do you work for and what do you do?

21 A   I'm a Probation Officer for U.S. Probation in the Eastern

22 District of Arkansas.

23 Q   Okay.  And have you had some contact with the defendant in

24 this matter, Mr. Terence Gordon --

25 A   Yes.

1    Q    -- this afternoon?

2    A    Yes, I have.

3    Q    And before you came into court for the earlier proceeding,

4    was Mr. Gordon interviewed by another officer with the

5    Probation Office?

6    A    Yes, he was.

7    Q    And who was that?

8    A    It was Officer Dorahn Garman.

9    Q    All right.  And did -- according to the practice of the

10   office, did Mr. Gorman [sic] -- Garman go ahead and record

11   answers to questions that Mr. Gordon gave?

12   A    He -- he did.  He filled out what we call a PS2, which is

13   a document that has several questions, one of which was where

14   he resided, and family information, other information.

15   Q    Okay.  And as -- as part of that interview process, does

16   the -- is it standard operating procedure for the Probation

17   Officer to tell the person that's being interviewed that it's

18   important that they answer those questions honestly?

19   A    That is correct.

20   Q    Okay.  And what information did the officer record that

21   Mr. Gordon gave to him about his residence?

22   A    Stated that he lived with his father in Iowa, and gave his

23   father's address.

24   Q    And what was the father's name?

25   A    It's Shabazz Williams.

1  Q   Okay.  And tell us, if you would, please, what specific

2  information about that is -- is recorded on the PS2 that the

3  officer took?

4  A   It has his father's name, and he stated that his address

5  was his father's address, which is 1017 North 10th Street in

6  Burlington, Iowa.

7  Q   Okay.  And did -- is -- was there information given to the

8  other officer about how long Mr. Gordon claimed to have been

9  living with Mr. Williams?

10  A   He claimed to have been living there approximately a

11  month.

12  Q   And then, was there also employment information that Mr.

13  Gordon gave to the officer about being employed in Iowa?

14  A   Yes.  He advised that he was employed at Baker's Pride in

15  Burlington, Iowa, since August.

16  Q   And did that officer, or either that officer or you, have

17  contact with Mr. Gordon's mother and girlfriend?

18  A   Yes.  I had contact with the girlfriend and the mother

19  just prior to court.

20  Q   Okay.  And did you have any conversation with them at that

21  time about where Mr. Gordon had been living for the last two

22  months?

23  A   Yes.  Both had advised that he -- that he had been living

24  with his father in Iowa.

25  Q   Okay.  And was there any discussion with those two women

1  about whether or not Mr. Gordon was also employed in the state

2  of Iowa?

3  A   I did not have conversation with -- I don't think I spoke

4  with the mother about Iowa, but she did mention in

5  conversation that he was employed in Iowa.  And I know his

6  girlfriend did state he was employed in Iowa.

7  Q   Okay.  And would you, please -- I'm just curious about

8  this -- were you -- how did this discussion take place about

9  where Mr. Gordon was living; did you ask them affirmatively

10 where he had been living?

11 A   Yes.  I specifically asked the girlfriend.  I had -- I had

12 gotten her information about where she lived, and I

13 specifically asked her if she was living with the defendant,

14 and she stated no, he lives with his dad.  I said, "So you all

15 are not living together?  He does not live with you?"  And she

16 stated he does not.

17 Q   Okay.  And based on the information that you have, where

18 do the mother and girlfriend live?

19 A   The mother lives in Luxora, which is in Mississippi

20 County.  And the girlfriend also resides in Burlington, Iowa,

21 at 300 Angular, Apartment 32.

22 Q   Okay.  For some reason, I think I thought both of the --

23 both the mother and the girlfriend lived in -- near

24 Blytheville?

25 A   No.  The girlfriend lives in Iowa.  And the mother lives

1   close to Blytheville.

2   Q   Okay.  And I know that there was some discussion in the

3   earlier hearing about Mr. Gordon having driven to Arkansas

4   from Iowa?

5   A   That is -- that is correct.

6   Q   Okay.  All right.  Then subsequent to the court hearing

7   -- I mean, you were present in the courtroom when the judge

8   addressed Mr. Gordon and he gave some answers to some

9   questions, and then I think you were here to hear the

10  conditions that were set --

11  A   Yes, I was.

12  Q   -- for him?  After the hearing concluded, did you then try

13  to make contact with Mr. Williams?

14  A   Yes, I did.

15  Q   And please tell us about that.

16  A   I contacted the defendant's father, advising him of the

17  conditions, that he was released on supervision, and that part

18  of his conditions is that he would be on electronic monitor at

19  his home.  And he stated -- I said, "Because to my

20  understanding, he's been living with you."  And he says, "No,

21  he has not.  He has not lived here for two months.  He's been

22  residing with his girlfriend, which lives just down the road."

23  And I said, "So, is that not going to be okay for him to

24  reside with you?"  And he stated he would have to talk with --

25  I guess he has a female friend that resides there, there's

1  other people in the home.  He stated that it was very crowded.

2  And he could not give me an answer if he could reside with him

3  or not.

4  Q   What happened next?

5  A   And I also spoke with him in the presence of the

6  defendant, we did get him on the phone, and he had stated if

7  you have to have a definitive answer now, it is no.

8  Q   Okay.  And so, when -- when we're saying "he," to whom --

9  A   The father.  The father was on speaker, with myself and

10  the defendant, and he definitively said at this point in time

11  it would be no, that he could not reside with him.

12  Q   And was there some other expression by Mr. Williams that

13  -- to the effect that Mr. Gordon knew why he could not live

14  with Mr. Williams?

15  A   That is correct.

16  Q   Okay.  And -- all right.  So did you have a discussion

17  with Mr. Gordon about the fact that what he had both told the

18  Court and allowed the Court to believe were not true?

19  A   Yes, I did.

20  Q   And can you tell us what he said?

21  A   Basically, he stated he would go back and forth between

22  his girlfriend's house and his father's house, and that he may

23  have stayed at his girlfriend's house, but he had clothes at

24  his father's house.

25  Q   And when you were talking to Mr. Williams, did he say

1  anything -- remind me again, if you would, about what he said

2  concerning where Mr. Gordon lived?

3  A    He stated that he had not lived in that home for two

4  months, that he was living with his girlfriend.

5  Q    And for purposes of the record, if you would, please,

6  would you just briefly talk about the pending charges that Mr.

7  Gordon has?

8  A    He does have pending charges out of Mississippi County.  I

9  really don't know all the circumstances regarding those, but I

10 do know that he is being charged with residential burglary,

11 kidnapping, theft of property, fraudulent use of a credit

12 card, battery second degree, aggravated robbery, and

13 possession of a firearm by certain persons.

14 Q    Okay.  And what information do you have about when he

15 picked up those charges?

16 A    He was arrested, I have May 18th, 2014.

17 Q    Okay.  And then the -- and I don't have this in front of

18 me, this kind of came up at the last minute here -- what

19 information do you have about the date on which he picked up

20 the charges here that -- that -- the underlying federal

21 charges?

22 A    To my recollection, I know he was -- I think a summons was

23 issued -- I believe -- I may not be correct, but from what I

24 remember looking at, a summons was issued in May, and he was

25 in custody on the charges I just mentioned.  And then he came

1  for initial appearance later in May, and a detainer was

2  placed, because he was in state custody at that point.

3  Q   Okay.  And in terms of his criminal history, are you able

4  to determine what his prior criminal history is?

5  A   Do you want me to just go through what I have?

6  Q   Please.

7  A   Okay.  I have 1/28/2011, he was arrested on driving under

8  the influence, suspicion of drugs.  He was found guilty.  Six

9  months license suspended.  Three days community service.  A

10  150 dollar reinstatement fee.  Alcohol education class.

11      I have 1/28/2011, possession of drugs.  It looks like that

12  was in District Court in Faulkner County.  He was found guilty

13  on 3/7/2011.  Six months license suspended.  A 100 dollar

14  reinstatement fee.

15      And on 1/28/2011, also unsafe vehicle and defective

16  equipment.  That was dismissed.

17      4/20/2011, charged out of Faulkner County Circuit Court

18  for theft of property.  He was convicted on 8/8/2012.  18

19  months probation and fine and costs.

20      2/29/2012, he had a failure to pay fines.  That was

21  dismissed.

22      3/12/2014, out of Osceola Police Department, he was

23  charged with possession of firearms by certain persons and

24  fleeing.  I do not have a disposition on that, although it's

25  been requested.

1    And then the charges from 5/18/2014 for aggravated

2  robbery, residential burglary, kidnapping, theft of property,

3  fraudulent use of a credit card, and possession of firearms by

4  certain persons, and battery second.  And he has court in that

5  of November of this year.

6  Q   Okay.  And for purposes of the record, how old is Mr.

7  Gordon; what's his date of birth?

8  A   His date of birth is 2/24/92.  He's 23 years old.

9  Q   Okay.

10          MS. JEGLEY:  I'll pass the witness.

11          THE COURT:  Ms. Sullivan?

12                      CROSS EXAMINATION

13  BY MS. SULLIVAN:

14  Q   Did Mr. Gordon turn himself in today?

15  A   Yes, he did.

16  Q   After driving all night from Iowa?

17  A   That is correct.

18  Q   And is he employed full time in Iowa?

19  A   Yes, he is.

20  Q   And did you, in the course of your investigation,

21  interview his mother?

22  A   I did.

23  Q   And would it be a possibility that he could live with her

24  in Luxora?

25  A   Yes, he could.

1  Q   Would electronic monitoring be possible if he lived in

2  Luxora?

3  A   Yes.

4  Q   Okay.  And does Mr. Gordon -- did -- it was not his fault

5  that he was able to bond out of Mississippi County; is that

6  correct?

7  A   I -- I don't have a whole lot of knowledge about that.  I

8  just know that he was released, I guess, in July.

9  Q   So the detainer that the Marshals placed was not honored

10 by Mississippi County?

11 A   That -- that is correct.

12 Q   Not of his own fault though?

13 A   Right.  That is correct.

14         MS. SULLIVAN:  No further questions, Your Honor.

15         THE COURT:  Thank you.

16         MS. JEGLEY:  I have no further witnesses and I have

17 no further questions from this witness.

18         THE DEFENDANT:  Your Honor, may I address you?

19         THE COURT:  Let me -- go ahead and be seated.  Ms.

20 Sullivan, do you have any witnesses that you intend to call?

21         MS. SULLIVAN:  Your Honor, I would just call his

22 mother, if I could, briefly.

23         THE COURT:  Okay.  You may.

24     MS. GORDON, DEFENDANT'S WITNESS, SWORN.

25                         DIRECT EXAMINATION

1  BY MS. SULLIVAN:

2  Q    Would you please state your name for the record?

3  A    Gordon.

4  Q    And how do you know the defendant?

5  A    [No audible response.]

6  Q    When -- did you bond him out of Mississippi County jail?

7  A    [No audible response.]

8  Q    And when he bonded out, did he live with you for a while?

9  A    [No audible response.]

10 Q    When did he move to Iowa?

11 A    [No audible response.]

12 Q    When was that?

13 A    August.

14 Q    Okay.  Could you speak up?  I'm sorry.

15        THE COURT:  Ma'am, I'm having a hard time hearing

16 you.  Pull that microphone closer to you.  Thank you.

17        THE WITNESS:  I don't recall the exact date, but it

18 was a little bit before August.

19 BY MS. SULLIVAN:

20 Q    Okay.  And were you under the impression he was living

21 with his father?

22 A    I was.

23 Q    Okay.  Yesterday, did -- Floyd is not here -- but Floyd

24 Hancock with my office contact you about locating your son?

25 A    Yes, ma'am.

1  Q   And did you get in contact with your son to tell him he

2  needed to appear here?

3  A   Yes, ma'am.

4  Q   And did he drive all night from Iowa to be here?

5  A   Yes, ma'am.

6  Q   Okay.  And if Mr. -- if your son could be released, could

7  he go live with you?

8  A   Yes, ma'am.

9  Q   Do you have a land line in your house?

10 A   No, ma'am, I have a cell phone.

11 Q   Cell phone.  Okay.  And does he have any job opportunities

12 in Luxora or Blytheville area?

13 A   Osceola and Blytheville.

14 Q   Okay.  Where would he -- where could he work, do you

15 think?

16 A   Kool-Aid factory, then -- or American Greetings.

17 Q   I could barely hear you.  Could you speak up?

18 A   Or American Greetings.

19 Q   Okay.  And would you have any problem with him living with

20 you?

21 A   No, ma'am.

22 Q   Do you know why his father would say that he hadn't been

23 living there?

24 A   I don't know.  I don't know if he's upset with him or

25 what.  He -- he has brought him home to take -- you know, for

1   him to go to court.  I don't know what happened.

2       I had talked to him to help and get in contact with him.

3   He's the one helped me, you know, get him here.  So I don't

4   know what happened.

5       I -- I think he didn't -- he's thinking like the

6   responsibility of it or if -- if the federal people have to do

7   something with him.  I think that's what happened, because

8   last night he -- he said he didn't mind, did I need for him to

9   come.  He was going to miss work.  I told him no, I would take

10  off.  We communicated right before I walked in here.  I think

11  the whole idea of it, he thinks it would have something to do

12  with him.

13  Q   Okay.  But you wouldn't have any problem if your son went

14  to live with you?

15  A   No, ma'am.

16  Q   And are you aware of his criminal history?

17  A   Yes, ma'am.

18  Q   Okay.  And you're aware of the charges that he's facing

19  right now?

20  A   Yes, ma'am.

21  Q   Would you be willing to contact the Court if he started

22  not complying with whatever conditions he could be placed on?

23  A   Yes, ma'am.  I -- I have driven to Iowa myself to get him

24  for a court date.  I have met people in St. Louis.  I will

25  make sure he -- he's at court.

1  Q   Okay.

2           MS. SULLIVAN:  No further questions at this time,

3  Your Honor.

4           THE COURT:  Ms. Jegley?

5                       CROSS EXAMINATION

6  BY MS. JEGLEY:

7  Q   Good afternoon, ma'am.

8  A   Good afternoon.

9  Q   And let me ask you, what -- well, all right, when you -- I

10 understood you to testify that you helped bond your son out on

11 the state charges in Mississippi County; is that right?

12 A   Yes, ma'am.

13 Q   And at the time that you did that, did you know that he

14 was under indictment in federal court?

15 A   Yes, ma'am, the probation officer here that I spoke with,

16 he told me when -- he told me I can go ahead and bond him out,

17 he said but somebody would pick him up.  They would pick him

18 up.  And then he said I would have to come here and a bond

19 would be set -- may or may not be set here.  He told me

20 somebody would come pick him up.  We sat there.  I even told

21 the bail bondsman that.  Nobody came.  Nobody said anything.

22 Q   Okay.  And I -- I'm not fussing about that.  What I --

23 A   Oh, no, ma'am.

24 Q   -- what I'd like to get to though is, at the time that you

25 were bonding out your son on the state charges, if you were

1    aware that he was under federal indictment, did you have any

2    discussion with him about his contacting his federal public

3    defender?

4    A   No, ma'am, because the paper I received said January.  It

5    had a -- said he'll go to court in January.

6    Q   Okay.  Well, are you aware that when your son was bonded

7    out, he did not contact his attorney to let her know that he

8    was no longer in state custody?

9    A   No, ma'am.  The gentleman that I spoke with, I told him

10   that.  It was the gentleman that came in when Mr. Hancock -- I

11   was waiting to speak with someone.

12   Q   Okay.  But what I'm getting at is, are you aware that two

13   -- about two months went by after your son got released from

14   state custody and he had no contact with his attorney to let

15   her know that he was out?

16   A   I -- I'll be honest, I don't know the procedures.  I don't

17   --

18   Q   Okay.

19   A   I don't -- I don't know.

20   Q   All right.  And then, okay, so if -- your son is now 23

21   years old, right?

22   A   Yes, ma'am.

23   Q   And the charges that were described go back for the last

24   four years or so?

25   A   When he went to college.

1  Q   Okay.  And so at the -- at the time that he was picking up

2  these other charges, was he living with you?

3  A   Far as sometime he would stay with me, sometime he would

4  be with -- at his girlfriend's house.

5  Q   Okay.  And what was -- when was the last time that he

6  actually lived with you?

7  A   Before he went to Iowa.

8  Q   I'm sorry?

9  A   Before he went to Iowa.

10 Q   Before he went to where?

11 A   Iowa.  To live with his dad, before he went to Iowa.

12         THE COURT:  Iowa.

13 BY MS. JEGLEY:

14 Q   To Iowa.  I'm sorry.  I'm getting old and hard of hearing.

15 Okay.  All right.  And that was a poor question.

16     Before he went to Iowa, around the end of July or early

17 August of this year, when, before that, had he lived with you?

18 A   I -- I don't remember.  I don't know.  I'm just -- I'm

19 really not together right now.  He wasn't with me -- living

20 with me when -- when trouble would happen.  He was over here

21 in school.  He was going to school.

22     And some of that stuff was supposed to be expunged from

23 his record.  The judge told me if he maintained a A and B

24 average, he would have it expunged.  And Ms. Bloodman, which

25 was his lawyer at the time, was supposed to take -- take care

1  of the paperwork.  But apparently, she didn't.  And I spoke

2  with her on yesterday, she said she was taking care of that

3  for me.

4  Q   Okay.  But -- but regardless of -- of whether or not his

5  state felony gets expunged, do you understand that he's still

6  a felon for purposes of this proceeding?

7  A   Yes, ma'am, I understand.

8  Q   Okay.  Who else lives in your home?

9  A   My other son, Deshawn Gordon.

10 Q   Okay.  And how old is he?

11 A   20.

12 Q   Has he gotten into trouble with the law?

13 A   No.

14 Q   Good for him.  Were you aware that -- that your son was

15 actually living with his girlfriend in Iowa?

16 A   Well, he started dating her and I knew he would spend the

17 night, but -- but she's on a program or something, so he can't

18 really live with her because of the assistance she's on or the

19 way the housing projects are set up.

20        MS. JEGLEY:  I believe that's all I have.

21        THE COURT:  Thank you.

22        Any redirect?

23        MS. SULLIVAN:  No, Your Honor.

24        THE COURT:  You may step down.  Thank you.

25     (Witness steps down.)

1      THE COURT:  Do you intend to call any other

2  witnesses, Ms. Sullivan?

3      MS. SULLIVAN:  I do not, Your Honor.

4      THE COURT:  Can you and Mr. Gordon come up, please,

5  to the podium?

6      Mr. Gordon, I'm very concerned about your

7  representations that you made to Probation and to me today.

8      THE DEFENDANT:  And --

9      THE COURT:  Let me finish.

10      THE DEFENDANT:  Okay.

11      THE COURT:  When you were asked where you live, you

12  represented you lived with your father.  Keeping clothes at

13  somebody's house doesn't constitute living with somebody.

14  Where you spend your nights is where you live.  And I believe

15  that you and your girlfriend misrepresented your living

16  situation to Probation and I think you misrepresented it to

17  me.

18      And there's a lot to be said for having credibility

19  before a Court that makes decisions about if you're going to

20  go to jail or not.  And I relied on what you told me in making

21  my decision.  And I'm very upset about what I've learned since

22  then.

23      Now, what I'm going to do right now, because I -- I

24  understand that Ms. Sullivan would like to offer your mother

25  as a third party custodian, I don't know enough information

1   right now to make that decision, I'm going to detain you for

2   right now.  I'm going to give Ms. Sullivan an opportunity to

3   get with Probation and see if there is a plan that can be

4   worked out that satisfies my concerns about where you're going

5   to be and what you're going to be doing.  Right now, I'm not

6   there.

7           THE DEFENDANT:  Okay.

8           THE COURT:  And so I'm going to give your lawyer this

9   opportunity.  And I -- I will address this issue again if --

10  if they come -- if you come back to me and ask for it to be

11  re-addressed with additional information.

12          But you have to understand that when -- when you're

13  asked a question, you need to be completely honest and not

14  withhold information, because we don't want to have to do this

15  again.

16          THE DEFENDANT:  I understand, Your Honor.  But as far

17  as misrepresentation or anything, like I didn't lie.  I mean,

18  I may have stayed a night here or a night there, but I have

19  been living with my father.  Like regardless of how ever he

20  felt when he got the phone call from her, I mean, obviously,

21  he took it as he -- federal, whoa, like, "I don't want nothing

22  to do with that."  Like that's his business.  That's his

23  business.

24          I have mail where I was living.  Like that's where I

25  really was living.  Like I'm not misrepresentating [sic] it.

1    I mean, I have a girlfriend, I do spend some nights there.

2    But that's where I was living.

3            THE COURT:  Well, let me just --

4            THE DEFENDANT:  And I don't see -- I don't --

5            THE COURT:  -- let me just say that I'm going to give

6    you an opportunity to find another option.  But with the

7    information that's before me right now, I have concerns about

8    the information you gave, in light of what your father said on

9    the phone, and in light of what your girlfriend also told

10   Probation, and what you told her.

11           THE DEFENDANT:  Okay.  Your Honor, I --

12           THE COURT:  So, and that's -- I'm not going to take

13   any more information at this time.  I am going to detain you

14   for now.

15           Ms. Sullivan, you get with Probation, see what you

16   can work out, see if there's something that might be suitable

17   and workable.

18           But until you can present me with something more

19   concrete, you know, and give Probation an opportunity to talk

20   -- talk more to the defendant's mother to find out about

21   getting a land line in place, I -- I don't feel like there's

22   anything else I can do right now.

23           So, that's going to be the order of the Court.  And

24   we will be in recess.

25       (Adjournment at 4:28 p.m.)

1      ELECTRONIC SOUND RECORDING CERTIFICATION:

2    I, court approved transcriber, certify that the foregoing is a

3    correct transcript from the official electronic sound

4    recording of the proceedings in the above-entitled matter.

5

6    /s/Robin Warbritton                October 5, 2016
     Signature of Approved Transcriber    Date

7

8    Robin Warbritton
     Typed or Printed Name

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25