IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION


| | |
|---|---|
| UNITED STATES OF AMERICA, | . |
| | . Docket No. 4:15-CR-00095-1 KGB |
| PLAINTIFF, | . |
| | . Little Rock, Arkansas |
| VS. | . November 6, 2015 |
| | . 10:09 A.M. |
| TERENCE GORDON, | . |
| | . |
| DEFENDANT. | . |
| . . . . . . . . . . . . . . . | |


TRANSCRIPT OF

DETENTION HEARING

BEFORE THE HONORABLE PATRICIA S. HARRIS

UNITED STATES MAGISTRATE JUDGE




ELECTRONIC COURT RECORDER-OPERATOR:  Ms. Colleen DuBose


Transcription Service:            Robin Warbritton
                                  Post Office Box 262
                                  Vilonia, AR  72173



PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING.

TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.

APPEARANCES:

For the Government:     Ms. Angela S. Jegley
                       U.S. Attorney's Office
                       Eastern District of Arkansas
                       Post Office Box 1229
                       Little Rock, AR  72203-1229

For the Defendant:      Ms. Molly K. Sullivan
                       Federal Public Defenders Office
                       The Victory Building
                       1401 West Capitol Avenue
                       Suite 490
                       Little Rock, AR  72201

1                    I N D E X

2                    DIRECT    CROSS    REDIRECT    RECROSS

3  GOVERNMENT'S WITNESSES:

4  Bryce Hicks            5        25        26

5  Kenny Baer            27

6  Dorahn Garman         43        48        50

7

8  DEFENDANT'S WITNESS:

9  Anita Wilks           52        56

10

11 EXHIBITS:                      IDENTIFIED      RECEIVED

12 Government's Exhibit No. 1          22            22
   Government's Exhibit No. 2           9             9
13 Government's Exhibit No. 3          10             9
   Government's Exhibit No. 4          10             9
14 Government's Exhibit No. 5          10             9
   Government's Exhibit No. 6          10             9
15 Government's Exhibit No. 7          17            17
   Government's Exhibit No. 8          17            17
16 Government's Exhibit No. 9          17            17
   Government's Exhibit No. 10         17            17
17 Government's Exhibit No. 11         17            17
   Government's Exhibit No. 12         17            17
18 Government's Exhibit No. 13         17            17
   Government's Exhibit No. 14         11             9
19 Government's Exhibit No. 15         11             9
   Government's Exhibit No. 16         17            17
20 Government's Exhibit No. 17         17            17
   Government's Exhibit No. 18         17            17
21 Government's Exhibit No. 19         13            13
   Government's Exhibit No. 20         13            13
22 Government's Exhibit No. 21         40            --
   Government's Exhibit No. 22         41            41
23 Government's Exhibit No. 23A        19            19
   Government's Exhibit No. 23B        19            19
24 Government's Exhibit No. 23C        19            19
   Government's Exhibit No. 23D        19            19
25 Government's Exhibit No. 23E        19            19
   Government's Exhibit No. 23F        19            19

4

1       P R O C E E D I N G S

2       (Call to order of the Court at 10:09 a.m.)

3           THE COURT:  You may be seated.

4           We are here this morning for a bond hearing in the

5   case of *United States v. Terence Gordon*, case number 4:15-CR-

6   0095-KGB.

7           The United States is here represented by Angela

8   Jegley today.  Welcome.

9           MS. JEGLEY:  Good morning, Your Honor.

10          THE COURT:  Good morning.

11          And Mr. Gordon's attorney representing him here is

12  Molly Sullivan.  Welcome, Ms. Sullivan.

13          MS. SULLIVAN:  Good morning, Your Honor.

14          THE COURT:  Hello, Mr. Gordon.

15          THE DEFENDANT:  Hello.

16          THE COURT:  Are the parties ready to proceed?

17          MS. JEGLEY:  Yes, Your Honor.

18          MS. SULLIVAN:  Yes, Your Honor.

19          THE COURT:  All right.  Ms. Jegley, you may call your

20  first witness.

21          MS. JEGLEY:  Your Honor, I would ask for the Rule,

22  please.

23          THE COURT:  The Rule will be invoked.  And any

24  witnesses who will be testifying today will need to step

25  outside the courtroom.  And there are two rooms outside the

1  courtroom that may be utilized for witnesses to sit in.   The

2  Court Security Officer is going to help you guys get situated.

3      (The Rule invoked.)

4          MS. JEGLEY:  Your Honor, I would call Bryce Hicks.

5          THE COURT:  Okay.  Mr. Hicks?

6      BRYCE HICKS, GOVERNMENT'S WITNESS, SWORN.

7                      DIRECT EXAMINATION

8  BY MS. JEGLEY:

9  Q   Would you please state your name?

10 A   Bryce Hicks.

11 Q   And, Mr. Hicks, who do you work for and what do you do?

12 A   I'm employed with the Mississippi County Sheriff's

13 Department and I'm a criminal investigator.

14 Q   And how long have you been involved in law enforcement?

15 A   16/17 years.

16 Q   Okay.  And how long have you been with the Mississippi

17 County Sheriff's Department?

18 A   Pretty much the entire time.

19 Q   All right.  And are -- have you been involved in an

20 investigation concerning a kidnapping and some other alleged

21 crimes involving Robert Birmington [sic]?

22 A   Yes, ma'am, Robert Birmingham.

23 Q   Okay.  All right.  [Cough.]  Excuse me.  How long have you

24 been involved in that investigation?

25 A   Since March of 2015.

1  Q   All right.  And would you please tell the Court how you

2  became involved in the investigation concerning Mr.

3  Birmingham?

4  A   On the morning of March -- March the 2nd, 2015, the

5  Sheriff's Department received a call, a 9-1-1 call, where a

6  gentleman had stated that he had been robbed and needed the

7  police.  At that point, we was -- the phone went dead.  We was

8  able to obtain an address of 508 East Calhoun in Luxora,

9  Arkansas.

10  Q   Luxora, Arkansas?

11  A   That's correct.

12  Q   And let me ask you to pull that microphone up a little bit

13  closer to you, because I want to make sure everybody can hear

14  you.

15      All right.  So after -- and would you again say what time

16  the call was received approximately?

17  A   Somewhere around 1:30 a.m. in the morning.

18  Q   All right.  And as a result of that telephone call, what

19  happened?

20  A   The Luxora Police Department, along with the Sheriff's

21  Department, responded to that address.

22  Q   And were you part of the initial response to the call?

23  A   No, ma'am.

24  Q   All right.  And so, based on the information that's

25  available to you, what happened after law enforcement

Hicks - Direct                                                    7

1  responded to the call?

2  A   Upon their arrival there at 508 East Calhoun, they was

3  unable to get anyone to the door, they made entrance through

4  the back door of the residence.  Immediately, when they went

5  in through the back door, they observed a wheelchair there.

6  As they were clearing the house, they're noticing that the

7  house is in disarray, things are turned upside down, turned

8  over.  They're finding phones, that's been ripped out of the

9  wall, lying in the floor.

10 Q   All right.  And when did -- when did you first get

11 involved in the investigation?

12 A   It was that morning, somewhere around 7:00 to 8:00

13 o'clock.

14 Q   Okay.  And were there photographs taken of the -- Mr.

15 Birmingham's house?

16 A   Yes, ma'am, there was.

17       MS. JEGLEY:  If I may, Your Honor, I'd like to

18 approach the witness -- well, let's do this another way.

19 BY MS. JEGLEY:

20 Q   There were photographs taken at the scene?

21 A   Yes, ma'am, there was.

22 Q   And were they taken on -- some time early on March the 2nd

23 of 2015; do you know whether they were?

24 A   Yes, ma'am.

25 Q   Okay.  And did you later look at those photographs?

1  A   I was present while the photographs were taken.

2  Q   All right.  What I'm going to do is a hand you a series of

3  photographs here and ask you to take a look at these and tell

4  us whether or not they accurately show, based upon your

5  arrival at the house, its condition at the time in question.

6  And I'm going to hand you what I've marked for identification

7  as Government's Exhibits 2 through 6.  Would you take a look

8  at those and tell us whether or not they accurately depict

9  what's shown?

10 A   Yes, ma'am.

11 Q   And now I'd also like to hand you Government's Exhibits

12 14, 15 -- 14 and 15 and ask you if these also accurately

13 reflect what was in the house on the morning in question?

14 A   Yes, ma'am, it is.

15 Q   All right.  Did you -- upon receiving the information that

16 we're talking about here, what did you do?

17 A   Upon my arrival, myself and other investigators then

18 started to process the -- the house, which was apparently the

19 crime scene.

20 Q   All right.  And so did you all attempt to gather some

21 forensic evidence?

22 A   Yes, ma'am, we did.

23 Q   All right.

24       MS. JEGLEY:  Now I'd like to go ahead and, if Ms.

25 Sullivan has no objection, I'm going to move admission of

1    Government's Exhibits 2 through 6 and 14 and 15.

2          MS. SULLIVAN:  No objection, Your Honor.

3          THE COURT:  They'll be admitted.

4      (Government's Exhibits No. 2, 3, 4, 5, 6, 14 and 15

5    received.)

6          MS. JEGLEY:  All right.  And if I may, I'd like to

7    hand these over to the Court.

8          THE COURT:  You may.  Thank you.

9    BY MS. JEGLEY:

10   Q    And if you can tolerate me standing over here --

11   A    Sure.

12   Q    -- let's go through some of these exhibits.  Would you

13   tell us, please, what Government's Exhibit 2 shows?

14   A    It shows a bedroom, a spare bedroom, of the house.

15        (Government's Exhibit No. 2 identified.)

16   BY MS. JEGLEY:

17   Q    All right.  And is Mr. Birmingham disabled?

18   A    Yes, he is.

19   Q    Do you happen to know the nature of his disability?

20   A    No, ma'am, I do not.

21   Q    Okay.  Do you know whether he's able to walk unassisted?

22   A    Yes, ma'am, he is.

23   Q    All right.  And then let's look here at Government's

24   Exhibit 3.

25   A    Yes, ma'am.  That is a wheelchair right inside the back

1   door of the residence.

2        (Government's Exhibit No. 3 identified.)

3   BY MS. JEGLEY:

4   Q   Okay.  And we see a -- is this his laundry room?

5   A   Yes, ma'am, this -- this picture here, coming in, is --

6   this would be the door.

7   Q   And --

8   A   And you can say -- it would be safe to say that that is a

9   laundry room.

10  Q   All right.  And then looking at Government's Exhibit 4,

11  would you please tell us what that is?

12  A   That is a footprint on the back door of the house.

13       (Government's Exhibit No. 4 identified.)

14  BY MS. JEGLEY:

15  Q   Okay.  And Government's Exhibit 5?

16  A   That is a phone that we located in the floor that had been

17  torn from the kitchen wall.

18       (Government's Exhibit No. 5 identified.)

19  BY MS. JEGLEY:

20  Q   And Government's Exhibit 6?

21  A   That is a -- the phone, which appears to be blood on it.

22       (Government's Exhibit No. 6 identified.)

23  BY MS. JEGLEY:

24  Q   All right.  And then let's go on over to Government's

25  Exhibits 14 and 15.  Would you tell us what those are?

1   A    That is a butcher knife that was located, I would call it

2   a computer room slash maybe spare bedroom.

3   Q    And we're talking about Government's Exhibit 14 here?

4   A    Yes, ma'am.

5        (Government's Exhibit No. 14 identified.)

6   BY MS. JEGLEY:

7   Q    And then what about Government's Exhibit 15?

8   A    The same location.

9        (Government's Exhibit No. 15 identified.)

10  BY MS. JEGLEY:

11  Q    Okay.  Now I think you said earlier that a call had been

12  received from Mr. Birmingham in the early morning.  At the

13  time the telephone call was received, did -- did law

14  enforcement or did you know where Mr. Birmingham was actually

15  located?

16  A    No, ma'am, we did not.

17  Q    To your knowledge, was Mr. Birmingham subsequently found

18  in Little Rock?

19  A    Yes.

20  Q    And did you end up having conversations with law

21  enforcement in Little Rock as a result of Mr. Birmingham

22  having arrived here?

23  A    Yes, ma'am.

24  Q    And do you recall whether they took place on March the 2nd

25  or whether that was maybe a day or two later?

1  A    It seems that that may have been a day or two later.

2  Q    All right.  And what information did you learn from law

3  enforcement in Little Rock about Mr. Birmingham's

4  circumstances here?

5  A    We received some information that Turod Jacobs was

6  residing in Little Rock.  We was getting information that

7  Terence Gordon and Terrell Harrell had brought Mr. Birmingham

8  to Little Rock with a safe that was taken from the residence.

9  Q    From whose residence?

10 A    From Mr. Birmingham's residence.

11 Q    All right.

12 A    During that course, we knew that Turod was on probation or

13 parole.  I contacted probation and parole, they went to his

14 address and came into contact with a couple of individuals

15 there.

16 Q    All right.  And during the course of your investigation,

17 did you also know or learn that Mr. Gordon had a previous

18 felony conviction, perhaps involving a firearm?

19 A    Yes, ma'am.

20 Q    All right.  And so, based on that information, what did

21 you do?

22 A    At which point?

23 Q    After -- after you -- let's go back.  You developed

24 suspects, right?

25 A    Yes, ma'am.

1   Q   And then what happened after that?

2   A   While probation and parole was there at Turod Jacobs'

3   residence, they had located a rifle and a holster, which was

4   sent to me.  It was then shown to Mr. Birmingham, at which

5   time he confirmed that that was his property that was taken

6   from his residence.

7   Q   All right.  Give me just a second here.  I'm handing you

8   what's been marked for identification as Government's Exhibits

9   19 and 20.  Would you please take a look at these and tell us

10  if you recognize them and if they accurately depict what's

11  shown there?

12  A   Yes, ma'am, I do.

13  Q   And what is Government's Exhibit 19?

14  A   That is a .30-06 that was reported taken as a result of

15  the invasion.  And the Exhibit 20 was identified as a holster

16  that was contained within the safe of Mr. Birmingham's.

17       (Government's Exhibits No. 19 and 20 identified.)

18          MS. JEGLEY:  Okay.  Your Honor, I'd move admission of

19  Government's Exhibits 19 and 20.

20          THE COURT:  Any objection?  Ms. Sullivan, any

21  objection?

22          MS. SULLIVAN:  No, Your Honor.

23          THE COURT:  They'll be admitted.

24       (Government's Exhibits No. 19 and 20 received.)

25          MS. JEGLEY:  Thank you.

1          THE COURT:  Thank you.

2    BY MS. JEGLEY:

3    Q    And, Mr. Hicks, where did you -- based upon your

4    conversations with Mr. Birmingham, where -- where did you

5    understand that the rifle that's shown in Government's Exhibit

6    19 had come from?

7    A    From his residence.

8    Q    Okay.  And what about the holster that was shown in

9    Government's Exhibit 20?

10   A    He identified that as being a holster that was contained

11   from within a safe that was stolen, as well, from the

12   residence.

13   Q    Okay.  So as a result of your having developed here, as I

14   understood it, Terence Gordon, Terrell Harrell, and Turod

15   Jacobs as suspects, what happened?

16   A    At that point, when the property was identified, probation

17   and parole were still at Turod's residence and they contacted

18   the Little Rock Police Department to send some investigators

19   there.

20   Q    All right.  And did you have some contact with Little Rock

21   Police Detective Kenneth Baer?

22   A    Yes, ma'am.

23   Q    And tell us about what kind of communication you had with

24   one another?

25   A    Detective Baer and I -- he had conducted a couple

1  interviews with some individuals.  The information was passed

2  on to him of our possible suspects.  While he was talking to

3  the occupants of -- that were at the residence where Turod

4  Jacobs was at, a name could not be put with who the two black

5  males were that came to the apartment in Little Rock and

6  brought the safe, as well as having communication and talking

7  about the incident that happened in Luxora.

8  Q   Okay.  Well, let's back up.  Maybe the clearer way to

9  describe this is, at some point, you did interview Mr.

10 Birmingham?

11 A   That's correct.

12 Q   And -- and did you interview him -- or do you know whether

13 you interviewed him before entry was made into Turod Jacobs'

14 apartment by probation and parole here in Little Rock?

15 A   No, ma'am.  That would have been after.

16 Q   All right.  Well, let's -- maybe the easier way to

17 understand this is for you to tell the Court, if you would,

18 please, what Mr. Birmingham told you about what happened

19 concerning a kidnapping and a theft?

20 A   Mr. Birmingham says -- he reported that he was awoken by

21 some banging, loud noises.  He was attempting to get out of

22 his bed.  He was -- he had reported that he had a shotgun that

23 he kept on top of his bed, at which time he was attempting to

24 load his gun, two black males with bandanas rushed him while

25 he was on the bed and had an altercation.  During the struggle

1  and altercation, he was taken to the room where his safe was

2  located, where he was tied up, he said, momentarily, and

3  beaten and stabbed with a knife.

4  Q   And what -- what did he tell you about who was -- I mean,

5  obviously, from what you've said, it -- was he able to

6  identify the robbers?

7  A   No, ma'am.

8  Q   Okay.  And then what specifically did he tell you about

9  the beating?

10  A   He said while he was lying on the floor that both

11  individuals were striking him, that he could tell it was from

12  two different people, but he was uncertain on who had stabbed

13  him with the knife or cut him.

14  Q   And then did you -- or were photographs taken of Mr.

15  Birmingham about a week after this incident occurred?

16  A   Yes, ma'am, they were.

17  Q   All right.

18          MS. JEGLEY:  I'm going to approach, if I may, Your

19  Honor?

20          THE COURT:  You may.

21  BY MS. JEGLEY:

22  Q   And hand Government's Exhibits 7, 8, 9, 10, 11, 12, 13,

23  16, and 17, and 18.  And would you tell us if these

24  photographs accurately depict Mr. Birmingham's condition a

25  week after this incident occurred?

1  A    Yes, ma'am.

2       (Government's Exhibits No. 7, 8, 9, 10, 11, 12, 13, 16,

3  17, and 18 identified.)

4           MS. JEGLEY:  At this time, Your Honor, I move

5  admission of the exhibits that I previously described.

6           MS. SULLIVAN:  No objection.

7           THE COURT:  They'll be admitted into evidence.  Those

8  are Exhibits 7, 8, 9, 10, 11, 12, 13, 16, 17, and 18.

9       (Government's Exhibits No. 7, 8, 9, 10, 11, 12, 13, 16,

10 17, and 18 received.)

11 BY MS. JEGLEY:

12 Q    All right.  So, I think you've talked about what Mr.

13 Birmingham told you took place at his residence.  Is there

14 anything else that I didn't ask you about that he told you

15 that took place there?

16 A    No, ma'am.

17 Q    Okay.  And so, after -- after they left the residence,

18 please tell us what he told you about how they left and who

19 left and what happened thereafter?

20 A    Mr. Birmingham reported that he was -- he was blindfolded

21 when he was placed in the vehicle.  He didn't know exactly

22 which direction they were going.  He said time from time he

23 was able to tell, from looking, peeking through his bandana,

24 that they were on Interstate 55 at one juncture.  And he was

25 still unable to determine who the two suspects were, that was

1  in the vehicle, due to them having bandanas on.  At another

2  juncture, noticed that he was on Interstate 40, but could not

3  tell us where.

4  Q   And did he relay any information to you about having --

5  well, let me back up a minute.  What kind of vehicle were they

6  in?

7  A   It was a white Chevrolet Avalanche.

8  Q   All right.

9  A   It's a truck.

10 Q   And was it a truck?

11 A   Yes, ma'am.

12 Q   Okay.  And did he tell you anything about their having

13 stopped in between the time that they left his house in Luxora

14 and the time that he arrived in Little Rock?

15 A   Yes, ma'am.  He did state that there was conversation on

16 the way that they were stopping at an ATM to attempt to gather

17 some cash from his debit card.

18 Q   And as part of your investigation, did you subpoena some

19 information from Regions Bank?

20 A   Yes, ma'am, I did.

21 Q   I'd like to hand you Government's Exhibit 23 -- Exhibits

22 23A through F.  And would you please tell us what these are?

23 A   Exhibit 23A is going to be a camera shot from the ATM

24 located in Marion, Arkansas, as well as 23B, 23C, 23A [sic] --

25 I'm not sure what your letter is here.

1  Q   Okay.  I'm sorry.  E.

2  A   23E and 23F.

3  Q   Okay.  And do you have the originals of -- or do you have

4  photographs from which those were copied?

5  A   Yes, ma'am.

6  Q   Is the resolution better on the -- the documents that were

7  given to you?

8  A   No, ma'am.

9  Q   Okay.  All right.  Would you please tell the Court what

10  times are shown -- the approximate times that are shown of

11  those ATM shots?

12  A   It looks like the first capture was at 2:40 a.m.  The

13  second capture was at 2:40 a.m.  And the third at 2:40 a.m.

14  Q   All right.  And do those all appear to be one stop at an

15  ATM outside of Marion?

16  A   Yes, ma'am.

17  Q   All right.

18        MS. JEGLEY:  At this time, Your Honor, I move

19  admission of Government's Exhibits 23A through F.

20        MS. SULLIVAN:  No objection.

21        THE COURT:  They'll be admitted.

22     (Government's Exhibits No. 23A, 23B, 23C, 23D, 23E, and

23  23F identified and received.)

24        MS. JEGLEY:  Thank you.

25  BY MS. JEGLEY:

1  Q   And are the times that are shown on those screen shots

2  consistent with the information that you have about the time

3  of the break-in at Mr. Birmingham's house in Luxora?

4  A   Yes, ma'am.

5  Q   All right.  And then during your interview with Mr.

6  Birmingham, what did he tell you about where he finally ended

7  up?

8  A   At an apartment complex in Little Rock.

9  Q   Was he able to identify -- give any more specifics about

10 where he ended up in Little Rock?

11 A   No, ma'am.

12 Q   And what did he -- what did he tell you about the

13 circumstances of his ending up in Little Rock?

14 A   He -- he said that he didn't know at -- where they were at

15 when they stopped.  He said but they, the two suspects, had

16 exited the vehicle, told him to keep the bandana over his eyes

17 and face.  He said he stayed there for a period of time.  At

18 that point, he got up, looked out, and there was a gentleman

19 that was next to the vehicle, who he had phoned the police.

20 Q   Okay.  Now, in terms of what was taken from the house,

21 you've talked about a safe that was taken from Mr.

22 Birmingham's home?

23 A   Yes, ma'am.

24 Q   Did you talk to him about the contents of that safe?

25 A   Yes, ma'am.

1    Q    And what did he tell you?

2    A    The contents of the safe, he stated there was some legal

3    documents in there, some cash, and a firearm, being a pistol.

4    Q    And what -- what type of pistol did he describe to you

5    that he said had been in the safe?

6    A    A Hi-Point 9 millimeter handgun.

7    Q    All right.  Is there anything else that I haven't asked

8    you about in terms of what he told you that would be helpful

9    for the Court to know?

10   A    No, ma'am.

11   Q    All right.  Now let's talk about -- you earlier said that

12   the -- the suspects that you all developed were Terence

13   Gordon, Terrell Harrell, and Turod Jacobs.  Do you know

14   whether those three men are related to one another?

15   A    I believe Terence and Turod -- the information that I

16   received is maybe Terence and Turod were kin somehow.

17   Q    Okay.  And as part of your conclude -- or your belief that

18   these three people were suspects, when you had communications

19   with Detective Baer, did you provide that information to him?

20   A    Yes, ma'am, I did.

21   Q    And do you know whether or not he developed a photo

22   spread?

23   A    Yes, ma'am.

24   Q    Was -- do you know whether or not Mr. Gordon and Mr.

25   Harrell were identified with use of the photo spread as having

1   been at Mr. Jacobs' apartment in Little Rock?

2   A    Yes.

3   Q    Now, I think we've already talked about it.  I know we've

4   admitted Government's Exhibit 19, the photograph of the

5   .30-06.  Do you remember what Mr. -- what, if anything, Mr.

6   Birmingham told you about that firearm?

7   A    I don't recall.

8   Q    Okay.  Did he identify it as his firearm?

9   A    Yes, ma'am.  Yes, ma'am.

10  Q    Okay.  Did you write a synopsis of your investigation?

11  A    Yes, ma'am, I did.

12  Q    And would you take a look at this and tell us if this is

13  the report you wrote?

14  A    Yes, ma'am, it is.

15  Q    And is the information included in it accurate to the best

16  of your belief?

17  A    Yes, ma'am.

18  Q    Based upon the time that you wrote it?

19  A    Yes, ma'am, as of that time.

20          MS. JEGLEY:  Your Honor, I move admission of

21  Government's Exhibit 1.

22          MS. SULLIVAN:  No objection.

23          THE COURT:  It will be received.

24      (Government's Exhibit No. 1 identified and received.)

25          MS. JEGLEY:  Thank you.

1  BY MS. JEGLEY:

2  Q    And as a result of the investigation, do you know if the

3  charges that are listed on Government's Exhibit 1 were filed

4  against Mr. Terence Gordon?

5  A    Yes, I do.

6  Q    And was Mr. Harrell also charged in the offense?

7  A    Yes, ma'am.

8  Q    Okay.  And with the same charges?

9  A    Yes, ma'am.

10 Q    All right.  And then, during the course of the

11 investigation, is it fair to say that there were attempts to

12 gather forensic evidence, both in your neck of the woods, up

13 in Mississippi County, and here in Pulaski County?

14 A    That's correct.

15 Q    And have you received some information about the results

16 of those forensic tests?

17 A    Yes, ma'am, I have.

18 Q    And is there any forensic evidence that ties Mr. Gordon to

19 the kidnapping?

20 A    None.

21 Q    All right.  And -- and in terms of the forensic evidence

22 that you did gather and got positive results on, would you

23 tell the Court about those?

24 A    We have positive results from Terrell Harrell, from a

25 cigarette butt that was left, from the crime scene.  We have

1  latent prints from the vehicle's -- from the victim's vehicle,

2  pertaining to Terrell Harrell.  We have Terrell Harrell's

3  prints on the knife and a piece of paper that was located in

4  the bedroom.  That would be it.

5  Q   All right.  Was there also a bandana that was recovered?

6  A   Yes, ma'am, there was.

7  Q   And I think you might have covered this earlier, but I

8  want to make sure that we cover this.  What were you told

9  about bandanas?

10 A   That bandanas were used on the victim, and that both

11 suspects, as they entered the house and throughout the time

12 that they were in the residence and in the vehicle, that the

13 victim knew that they were both wearing bandanas.

14 Q   Okay.  And was there a victim -- I mean, was there a

15 bandana recovered from the truck when it was found in Little

16 Rock?

17 A   Yes, ma'am.

18 Q   And do you know whether there was blood evidence that was

19 found on that bandana?

20 A   Yes, ma'am, there was.

21 Q   Have we received a final forensic report on that at this

22 time?

23 A   No, ma'am, we haven't.

24 Q   And I may have already asked you this, so forgive me if

25 I'm plowing territory again here.  Based upon your

1  communications with Detective Baer, were -- were you told

2  whether or not witnesses down here positively identified Mr.

3  Gordon and Mr. Harrell as having been at Turod Jacobs'

4  apartment in Little Rock?

5  A    That is correct.

6  Q    And then did that factor in to a decision to charge Mr.

7  Gordon and Mr. Harrell with kidnapping and the other charges

8  that are shown on Government's Exhibit 1?

9  A    Yes, ma'am, it was.

10        MS. JEGLEY:  I'll pass the witness.

11        THE COURT:  Ms. Sullivan?

12                    CROSS EXAMINATION

13 BY MS. SULLIVAN:

14 Q    Sergeant Hicks, just to be clear, there was no forensic

15 evidence that tied Mr. Gordon to this offense -- or these

16 offenses; is that correct?

17 A    Yes, ma'am.  That's correct.

18 Q    And did you show Mr. Birmingham a photo spread in the

19 hopes that perhaps he could identify someone, even though they

20 were wearing bandanas?

21 A    No, ma'am, I did not.

22 Q    Okay.  Mr. Gordon was charged with the offenses listed on

23 your synopsis; is that correct?

24 A    That's correct.

25 Q    Did he turn himself in on those charges?

1   A   Yes, ma'am, he did.

2   Q   Okay.  Did he make bond on those charges?

3   A   Yes, ma'am.  What information I have is that on 5/18 of

4   2015, he surrendered himself to the Mississippi County

5   Sheriff's Department, and a 250,000 dollar cash bond was

6   issued.

7           MS. SULLIVAN:  May I have one moment, Your Honor?

8           THE COURT:  Yes.

9           MS. SULLIVAN:  No further questions, Your Honor.

10                      REDIRECT EXAMINATION

11  BY MS. JEGLEY:

12  Q   Mr. Hicks, did you even show the photo spread to Mr.

13  Birmingham?

14  A   No, ma'am.

15  Q   And do you know how the photo spread was put together?

16  A   Detective Baer created the photo lineup.

17  Q   Thank you.

18          MS. JEGLEY:  And, Your Honor, if Ms. Sullivan has no

19  further questions, I would ask that he be excused, because

20  he's got some family business that he'd like to attend to.

21          MS. SULLIVAN:  I have no problem with that, Your

22  Honor.

23          THE COURT:  Okay.  You may be excused.  Thank you.

24          THE WITNESS:  Thank you.

25      (Witness excused.)

1        MS. JEGLEY:  I will call Detective Kenny Baer with

2   the Little Rock Police Department.

3        KENNY BAER, GOVERNMENT'S WITNESS, SWORN.

4                           DIRECT EXAMINATION

5   BY MS. JEGLEY:

6   Q    Would you please state your name?

7   A    I'm Kenny Baer with the Little Rock Police Department.

8   Q    Okay.  I'm a little bit hard of hearing, so let's get that

9   microphone up there.  Okay?

10       Detective Baer, how long have you worked for the Little

11  Rock Police Department?

12  A    I'm in my 25th year.

13  Q    Okay.  And which -- where are you housed right now?

14  A    I work out of the Northwest Patrol Division.

15  Q    All right.

16  A    10001 Kanis.

17  Q    Okay.  And is that close to Baptist Hospital in West

18  Little Rock?

19  A    Yes, ma'am.

20  Q    And are you familiar with the Treasure Hills area of

21  Little Rock?

22  A    Yes, ma'am.

23  Q    And can you tell us where that is -- well, let me ask you

24  this, do you -- are you familiar -- also familiar with -- let

25  me back up.  Are you familiar with Turod Jacobs?

1  A   Yes, ma'am.

2  Q   And how are you familiar with him?

3  A   His name was developed during an investigation.  His name

4  came up in an investigation that was kind of started by the

5  Arkansas Parole Office.

6  Q   Okay.  And did you end up interviewing him on March the

7  4th of 2015?

8  A   Yes, ma'am, I did.

9  Q   And was he Mirandized before you interviewed him?

10 A   Yes, ma'am, he was.

11 Q   And what caused you to interview Turod Jacobs?

12 A   Mr. Jacobs had been residing at an apartment complex on

13 Reservoir Road, along with his brother.  The parole office had

14 went there to look for Mr. Jacobs for some type of warrant

15 that he had.  Once they got there, he was not there.  But

16 after they gained access to the apartment, they located some

17 firearms, and one of which was stolen.  There were two other

18 parties in the residence at that time, and they had been

19 detained by the parole office.

20 Q   Okay.  And were you then called to the apartment --

21 A   Yes, ma'am.

22 Q   -- on March the 4th of 2015?

23 A   No -- yes, on March the 4th.

24 Q   Okay.  And were there -- you said -- I think you said

25 there were a couple of people who were there at the apartment?

1   A    Yes, ma'am.

2   Q    And did you interview them?

3   A    Yes, ma'am, I did.

4   Q    Okay.  And at the time that you interviewed them, did you

5   have the name of any suspect, other than Turod Jacobs?

6   A    No, ma'am, I did not.

7   Q    Okay.  And so when you interviewed these other two people,

8   would you tell us who they were?

9   A    One was Ashton Bailey.  He is a black male.  And then it

10  was his girlfriend, McKeina Hadley.

11  Q    Okay.  All right.  During the course of your

12  investigation, did you develop -- did you have reason to

13  believe that these two people might know more about an

14  incident than -- than you had heard about?

15  A    Yes, ma'am, I did.

16  Q    Okay.  And so, would you please tell us what information

17  -- what questions you asked of Mr. Bailey and Ms. Hadley and

18  what information they gave you?

19  A    Initially, I interviewed both of them based on the

20  information of it just being recovery of -- of stolen

21  property.  After speaking with Ms. Hadley, she began talking

22  about some people showing up with -- or some -- somebody known

23  to Turod Jacobs had shown up at the apartment with a safe.

24  And then she said that -- that they may have jumped on

25  somebody or maybe had robbed somebody to get to the point of

1  being at that apartment.

2      And at that time, I kind of stopped the interview, because

3  it was obviously more than just stolen property offense.  And

4  then I contacted Sergeant Hicks with the Mississippi County

5  Sheriff's Office and talked to him about what might have been

6  told, and he confirmed that an incident had taken place down

7  in Mississippi County.

8      And then I had remembered the initial call taking place

9  two days prior, in our city, where a gentleman had been left

10 abandoned in his vehicle and had been robbed.

11 Q   All right.  And so based upon that information, the

12 information that you got from Mr. Bailey, Ms. Hadley, and

13 Sergeant Hicks, what did you do?

14 A   I again interviewed her a little more at length to see

15 what she knew about the incident as a whole.  And then

16 Sergeant Hicks provided me with the name of a possible

17 suspect.  And with that name, I went ahead and developed a

18 photo spread and showed it to Mr. Bailey and Ms. Hadley.

19 Q   All right.  Was there only one spect [sic] -- suspect that

20 he named to you, or were there two?

21 A   On that night, there was just one suspect.

22 Q   Okay.  And do you remember who that was?

23 A   It was Terence Gordon.

24 Q   All right.  And so when you put together the photo spread

25 or the photo array, how did you do that?

1  A    I obtained photographs from JusticeXchange database and

2  put them in a sequence of three on top, three on bottom.  And

3  then eventually showed it to Mr. Bailey and Ms. Hadley.

4  Q    And what was the result of your showing the photo spread

5  to both of those individuals?

6  A    They identified Mr. Jacobs [sic] as the person they had

7  seen at the apartment.

8  Q    All right.  I think you said --

9  A    I'm sorry.  Mr. Gordon.  I'm sorry.

10 Q    All right.  And was there anything else that they told you

11 about Mr. Gordon and information that they had learned about

12 him at the time that he had been at Mr. Jacobs' apartment?

13 A    They thought he was Mr. Jacobs' cousin.  And that he had

14 just shown up early in the morning, which would have been the

15 2nd, I believe, of March.  And that he had shown up early that

16 morning.  And they gave some -- Mr. Hadley [sic] gave some

17 physical descriptors of his hair being in twists at that time.

18 Q    All right.  And were they able to tell you anything else

19 about what happened when Mr. Gordon showed up in the early

20 morning hours of March the 2nd?

21 A    Yes.  Both said that he arrived with another individual,

22 and that Mr. Jacobs, Mr. Gordon, and the other individual,

23 brought in a -- a safe, and they were attempting to access the

24 contents of that safe, and they were having trouble doing so.

25 They -- eventually, they were able to gain access to the safe,

1   got a firearm and some money out of the safe.

2   Q   Okay.  And was -- at some point then, were Ms. Hadley and

3   Mr. Bailey able to identify the person who came to the

4   apartment with Mr. Gordon?

5   A   Yes, ma'am.

6   Q   And did you do another photo spread?

7   A   Yes, ma'am.

8   Q   Did you put it together the same way?

9   A   Yes, ma'am.

10  Q   And what was the result?

11  A   They identified an individual by the name of Terrell

12  Harrell --

13  Q   Okay.

14  A   -- as the other person that had arrived at the apartment.

15  Q   All right.  And is -- is Ashton Bailey a felon, to your

16  knowledge?

17  A   Yes, ma'am.

18  Q   And what did -- what did Mr. Bailey and Ms. Hadley tell

19  you about why they were in Turod Jacobs' apartment at this

20  point in time?

21  A   When I interviewed them, they said that they were homeless

22  and that they had been there to take showers and change

23  clothes.

24  Q   Okay.  Now, subsequent to this, was Mr. Jacobs arrested --

25  was there a warrant issued for his arrest?

1  A    Yes, ma'am.

2  Q    And then was he arrested some time around March the 18th

3  of 2015?

4  A    Yes.  Yes, ma'am, I believe that's around the right time.

5  Q    Okay.  And so, then did you then interview him?

6  A    Yes, ma'am.

7  Q    And let's center in about questions that you asked about

8  Mr. Gordon and Mr. Harrell.  What did Mr. Jacobs tell you

9  about any kind of familial relationship with Terrell Harrell

10 and Terence Gordon?

11 A    He said that they were his cousins.

12 Q    All right.  And what did he tell you about what happened

13 on the morning of March the 2nd?

14 A    He said that they had arrived at his apartment -- or Mr.

15 Gordon had arrived and knocked on his door, and said he needed

16 a hand with a safe.  And Mr. Jacobs got dressed, went up, and

17 they brought this safe down into the apartment.  And --

18 Q    Did he describe to you how many people it took to handle

19 the safe?

20 A    Mr. Jacobs says it was every male person that was in the

21 apartment at that time, which would have been Mr. Jacobs, Mr.

22 Bailey, Mr. Gordon, and then it would have been Mr. Harrell.

23 Q    All right.  Please continue.

24 A    So they eventually rolled it down the apartment stairs, to

25 the lower level of where his apartment was located, and put it

1  inside.  And over the next several hours, they used various

2  tools to try to get into the safe.  At some point during the

3  -- this process, Mr. Jacobs asked, you know -- you know, kind

4  of what was going on.  And, you know, he said that they had

5  gotten an old man.  I don't recall if he specified where.  But

6  drove him up from -- I think "the country" is what he termed.

7  And I believe he said that they even had to jump on him

8  because he went for a gun or something to that effect.

9  Q    All right.  Let me -- was your interview with Mr. Jacobs

10 tape recorded?

11 A    Yes, ma'am.

12 Q    And then -- and then transcribed?

13 A    Yes, ma'am.

14 Q    Let me -- let's back up just a little bit.  When you asked

15 him -- I believe you asked him where the stuff came from,

16 meaning the safe?

17 A    Yes, ma'am.

18 Q    And do you recall what he told you about that?

19 A    They said that they had got it from an old man, as I

20 recall.

21 Q    Okay.

22         MS. JEGLEY:  Let me, if I may, Your Honor, I'd like

23 to approach the witness briefly.

24         THE COURT:  You may.

25 BY MS. JEGLEY:

1  Q   Would you please take a look at pages 12 and 13 of this

2  transcript of your interview with Mr. Jacobs and read to

3  yourself at the bottom of page 12 and then into page 13,

4  please?  Does that refresh your memory?

5  A   Yes, ma'am.

6  Q   Okay.  And so when you asked Mr. Jacobs if he knew where

7  this stuff had come from, what did he tell you?

8  A   Mr. Jacobs says that he didn't know where the guns had

9  come from.  And that, as far as he knew, that they had hit a

10 lick, which in street talk is a theft or robbery or coming

11 across something more than just normal.

12 Q   Okay.  And we'll talk here about the guns in a minute, but

13 I'd like to center on what he told you in that interview about

14 the information that he got from Mr. Gordon and Mr. Harrell

15 about the incident as it related to a kidnapping.

16 A   He said that they had been smoking and driving and --

17 Q   "They" meaning who?

18 A   His cousins, Mr. Gordon and Mr. Harrell.

19 Q   All right.

20 A   And that they had been in Luxora, and had gotten on a --

21 jumped on an individual, and that they had driven from Luxora

22 with him, and during that trip had withdrawn some money, from

23 the trip from Luxora to Little Rock.

24 Q   Okay.  And when he was telling you this, was he saying

25 that they were cracking jokes about how one of them dove on

1  the man?

2  A   Yes, ma'am.  He said he didn't know if they had harmed

3  that individual or not, but he said he didn't ask that much

4  about it either.

5  Q   Okay.  And so, then did you ask him -- did you follow up

6  with a question about whether they had jumped on him?

7  A   Yes, ma'am, I did.  And his reply to that was, you know,

8  he thought they were talking about jumping on the bed or

9  something to that effect.

10 Q   Okay.  And I think you testified earlier that you went to

11 the apartment, to Turod Jacobs' apartment, on March the 4th?

12 A   Yes, ma'am.

13 Q   All right.  And tell us about guns.

14 A   After I had arrived there, the probation and parole

15 officers had already secured all the weapons and made them

16 safe, and they were sitting on a pool table that was located

17 in what would be the living room of the apartment.  There was

18 a hunting rifle that was recovered by the probation and parole

19 officers that had been on the floor in this -- that same room.

20 And then there was an assault type weapon that had been

21 located in the easternmost bedroom or the furthest bedroom at

22 the end of the hallway.

23 Q   All right.  And during the interview with -- well, let me

24 hand you what's already been received as Government's Exhibit

25 19.  Do you recognize that?

1    A    Yes, ma'am.

2    Q    And would you tell us about that gun?

3    A    It appears to be the Remington .30-06.

4    Q    And did you discuss that firearm with Mr. Jacobs?

5    A    Yes, ma'am.

6    Q    What did he tell you about it?

7    A    He said that was one of the guns that was brought into the

8    residence by Mr. Gordon.  And that after Mr. Gordon left, he

9    left that as a house gun.

10   Q    All right.  And are you familiar with the term "house

11   gun"?

12   A    Yes, ma'am.

13   Q    And -- and based on your experience, what does that mean?

14   A    It's just a gun they use for the purposes of security for

15   whatever activity is going on inside.

16   Q    All right.  And when -- when the -- when you were there,

17   was there also some evidence of drug activity?

18   A    Yes, ma'am.  There were several smaller sets of scales.

19   Q    All right.  And then I'd like to show you Government's

20   Exhibit 20, which has also been received.  Do you recognize

21   that?

22   A    Yes, ma'am.

23   Q    And would you tell us about that?

24   A    That is a holster that contained a Hi-Point semi-automatic

25   pistol that had been in the safe that was taken from Luxora.

1  Q   Okay.  And at the time -- now, you've identified the

2  holster as containing a firearm.  Was the firearm actually

3  recovered, at least at this point in the investigation?

4  A   The -- the handgun?

5  Q   Yes.

6  A   No, ma'am.  The rifle was.

7  Q   All right.  And -- all right.  Talking about the -- the

8  holster there for the firearm we've just been discussing, was

9  it a Hi-Tech 9?

10 A   Hi-Point.

11 Q   Hi-Point 9.  Okay.  So what did Mr. Jacobs tell you about

12 the Hi-Point 9?

13 A   He said that Mr. Gordon retained possession of that.

14 Q   All right.  And then you've already testified that the --

15 that several people broke in to the safe.  What did Mr. Jacobs

16 tell you about who actually participated in breaking in the

17 safe and what they did before they were actually able to

18 access it?

19 A   Mr. Gordon and Harrell, he said, were the ones that were

20 actively using the tools to try to gain access to the safe.

21 Q   Had they gone to several Walmarts to get tools to access

22 it?

23 A   They had gone -- they had left -- they had left the

24 apartment in Mr. Jacobs' brother's vehicle and had gone to two

25 of the local Walmarts in West Little Rock.

1  Q   All right.  And so, let's go back then to who was actually

2  breaking in to the safe?

3  A   It was Mr. Gordon, Mr. Harrell, and that was according to

4  Mr. Jacobs.

5  Q   Right.  And then what was found inside the safe, according

6  to Mr. Jacobs?

7  A   There was a couple thousand dollars in cash, the gun and

8  the holster, and there may have been a checkbook, but I never

9  recovered the checkbook.

10 Q   All right.  And speaking of checkbook or money, did Mr.

11 Jacobs say anything to you about Gordon and/or Harrell having

12 told him that as they drove Mr. Birmingham, or this person,

13 from Luxora to Little Rock, that stops were made to pick -- to

14 try to get cash?

15 A   Yes, ma'am.  He did say that.

16 Q   And what do you remember about his telling you?

17 A   He said that they had made several stops while they were

18 driving from Luxora to Little Rock and trying to get money

19 with a card.

20 Q   Okay.  And then once the safe is opened and the -- this

21 Hi-Point 9 has been found with the holster and there's cash in

22 there, how much money did he say was found in the safe?

23 A   As I recall, it was about 2,000 dollars.  He said it

24 wasn't much more than that.

25 Q   And what did he tell you about what happened to that cash?

1  A   He said the money was divided up among the people that

2  were there.  They each got -- most everybody got a smaller

3  amount, he got a little more than everybody else.  And then

4  Mr. Gordon and Mr. Harrell had the predominant amount of cash.

5  Q   Okay.  Now I'd like to show you one other photograph here,

6  it's Government's Exhibit 21.  Are you able to identify what

7  that item is?

8  A   Yes, ma'am.  That's the phone -- cell phone that was

9  identified as belonging to the victim from Luxora.

10      (Government's Exhibit No. 21 identified.)

11 BY MS. JEGLEY:

12 Q   Okay.  And now, were you aware of where Mr. Birmingham and

13 this truck were found on March the 2nd of this year?

14 A   Initially, I remember the call being on Treasure Hill

15 Drive.  And I didn't -- I just remember that incident, but it

16 was on Treasure Hill Drive, which --

17 Q   Okay.  And then Mr. Jacobs' apartment at the time was off

18 Reservoir Road?

19 A   Yes, ma'am.

20 Q   And do you know where Treasure Hill is -- that -- that

21 neighborhood is located in relation to the area of Reservoir

22 Road that we're talking about?

23 A   It actually runs off of the southern end of Reservoir

24 Road, near the -- what would be the Walgreens, Professor Bowl.

25 Q   Okay.  And so the -- the -- if I remember right, the

1   apartments were Beacon Hill Apartments off --

2   A    Yes, ma'am.

3   Q    -- off Reservoir?

4   A    Yes, ma'am.

5   Q    Okay.  And so how long -- if you're familiar with the

6   area, do you have any estimate of how long it would take to

7   get from where the truck was recovered, then to Mr. Jacobs'

8   apartment at Beacon Hill?

9   A    Driving time, it would just be a matter of a couple of

10  minutes.

11  Q    Okay.  If they were on foot, do you have any idea how long

12  it would take?

13  A    On foot, probably 15 minutes maybe.  I'm not a good judge

14  on foot speed.

15  Q    Okay.  That's fair.  Did you write a report of your

16  investigation?

17  A    Yes, ma'am.

18  Q    And I'd like to hand you Government's Exhibit 22.  Is this

19  that report?

20  A    Yes, ma'am.

21          MS. JEGLEY:  I move admission of Government's Exhibit

22  22.

23          MS. SULLIVAN:  No objection.

24          THE COURT:  It will be received.

25      (Government's Exhibit No. 22 identified and received.)

1  BY MS. JEGLEY:

2  Q   Was the safe recovered?

3  A   No, ma'am, it was not.

4  Q   All right.  Is there -- okay.  Let me also ask you, were

5  there -- were there any other guns that were discussed when

6  Mr. Jacobs -- you interviewed him?  And I'm not asking about

7  any that -- any others that he would have possessed, but any

8  that he thought were in Mr. Gordon's custody, other than the

9  Hi-Point 9 that we talked about?

10 A   He mentioned that there was a shotgun that was with the --

11 the rifle, but it had been sold prior to us ever arriving at

12 the apartment.

13 Q   Okay.  And can you be a little bit more specific about

14 what he told you about the shotgun that had been sold before

15 you got involved?

16 A   I had asked him about what happened to it, and he said

17 that Mr. Bailey had sold it.  I asked him, "Do you recall who

18 he sold it to?"  And he said, "Another GD."

19 Q   Okay.  Was this -- here's what I'm trying to get at, and

20 I'm doing a really poor job of it, was -- was this other

21 shotgun, that we're talking about now, related to Mr. Gordon

22 or Mr. Harrell in any way based upon what Mr. Jacobs told you?

23 A   It -- the shotgun was one of the other guns that was

24 brought into the apartment along with the rifle and safe.

25 Q   Okay.  And do you -- based upon your conversation with Mr.

1  Jacobs, do you know whether or not this other firearm had been

2  stolen from Mr. Birmingham?

3  A    That's what I came to the conclusion, was that it was

4  stolen with these other firearm.

5  Q    Okay.  Is there anything else that I haven't asked you

6  about that you think would be helpful for the Court to know?

7  A    No, ma'am, not right off.

8           MS. JEGLEY:  I'll pass the witness.

9           MS. SULLIVAN:  We have no questions, Your Honor.

10           THE COURT:  Okay.

11           MS. JEGLEY:  I have no further questions for the

12  detective.  May he be excused?

13           THE COURT:  Yes, he may.  Thank you, Detective.

14       (Witness excused.)

15           MS. JEGLEY:  Your Honor, at this time, I will call

16  Dorahn Garman, and I anticipate that he'll be my last witness.

17           THE COURT:  Okay.

18       DORAHN GARMAN, GOVERNMENT'S WITNESS, SWORN.

19                         DIRECT EXAMINATION

20  BY MS. JEGLEY:

21  Q    Would you please state your name?

22  A    My name is Dorahn Garman.

23  Q    Okay.  And for purposes of the record, who do you work for

24  and what do you do?

25  A    Pretrial Services in the Eastern District of Arkansas.

1  And I supervise a caseload of pretrial defendants.

2  Q    And is Terence Gordon one of those persons that you

3  supervise?

4  A    He is -- his case was assigned to me for the initial

5  investigation, yes, ma'am.

6  Q    Okay.  And what I'd like to do, if I could, Mr. Garman, is

7  have you testify to the -- from reports and information you

8  have about the facts underlying the indictment that is now

9  pending against Mr. Gordon.

10 A    Yes, ma'am.  There was a -- an arrest of Mr. Gordon on

11 about -- on or about March the 12th of 2014 in Mississippi

12 County, and he was charged with possession of a firearm by

13 certain persons and fleeing.

14 Q    And what information do you have about the underlying

15 facts according to the police reports that you've received?

16 A    Yes, ma'am.  On or about March the 11th, Osceola Police

17 received a telephone call stating that two males were

18 brandishing a firearm out of a sport utility vehicle.  Police

19 obtained information indicating that the driver was Terence

20 Gordon.  Police were able to locate the vehicle and observed

21 Mr. Gordon and another un -- unknown subject nearby the

22 vehicle.  Officers noticed that the unknown subject appeared

23 to be concealing something in his waistband.  And as they

24 approached, the unknown subject fled on foot.  A short

25 distance later, that unknown subject was apprehended and taken

1   into custody.  He was identified as being Turod Jacobs.

2   Police recovered from Mr. Jacobs a small Baggie containing a

3   green leafy substance that they suspected to be marijuana,

4   from his person, and a -- and one live 9 millimeter round.

5        During the chase, they also observed Mr. Jacobs discard an

6   item as he was fleeing.  And they later located that item and

7   determined that it was a THE COURT:-9, 9 millimeter, with a

8   double stack magazine, and it also had an inserted magazine of

9   35 live rounds.

10  Q   Let me stop you there.  I've read through this.  Based on

11  the police reports that you received, do you recall there

12  being any information in there to the effect that Mr. Gordon

13  was also attempting to evade the police during the -- after

14  the -- the point at which this SUV had been located in which

15  both Mr. Gordon and Mr. Jacobs were seen?

16  A   Yes, ma'am.

17  Q   Okay.  [Cough.]  Excuse me.  And subsequent to that, was

18  there a search warrant obtained to search the vehicle?

19  A   Yes, ma'am, there was.

20  Q   And would you tell the Court then what was found?

21  A   The search warrant was obtained on March the 12th, the

22  following day, and the vehicle that was driven by Mr. Gordon

23  was searched and officers confiscated a 9 millimeter pistol

24  with a 15 round magazine and one live round chambered into the

25  -- the pistol.

1   Q   And based on the information -- [cough] I'm sorry --

2          THE COURT:  That's okay.  You've having to talk a

3   bunch.

4   BY MS. JEGLEY:

5   Q   Based on the information that you had available to you,

6   were you able to tell where the firearm and the rounds were

7   located in relation to the driver's seat of that vehicle?

8   A   According to the police report, it said that the firearm

9   was discovered in the front area of the vehicle.

10  Q   Okay.  Is there anything else, any other information that

11  you have that would be pertinent to Mr. Gordon's detention or

12  being released on bond that I haven't asked you about and that

13  you think the Court would -- it would be helpful for the Court

14  to know?

15  A   Yes, ma'am.  I -- after his initial appearance at his

16  detention hearing, I was able to get in touch with his state

17  bondsman, out of Mississippi County, and the bondsman advised

18  me, Your Honor, that he was not aware that Mr. Gordon was

19  residing in Indiana [sic].  And so after I spoke with him, he

20  advised me that he was going to be notifying the state

21  authorities that Mr. Gordon had not informed him that he had

22  relocated.

23  Q   Okay.  And coming back to that, you said that the officer

24  was not aware that Mr. Gordon was living in Indiana; is that

25  the information that you had or that the probation officer

1  [sic] had, about Indiana?

2  A   That was the information that Mr. Gordon had provided to

3  us during his interview.

4  Q   Okay.  Is it possible that Mr. Gordon had told Probation

5  here that he was actually living in Iowa, Iowa rather than

6  Indiana?

7  A   I said Indiana, excuse me, I meant Iowa.  I'm sorry.  I

8  stated Indiana, but I meant Iowa.

9  Q   Okay.  And did -- what did his probation officer [sic]

10  tell you about any kind of information that he had about Mr.

11  Gordon and when Mr. Gordon was able to make bond out of

12  Mississippi County?

13  A   He -- we did not discuss a lot of detail about that

14  because he -- when I contacted the bondsman, he was not in his

15  office, and he didn't have Mr. Gordon's file in front of him,

16  so he wasn't able to provide me a lot of information about

17  when he actually made bond in the state case.

18  Q   Okay.  I -- and I may have gotten this wrong, my mind is

19  telling me that you talked to his -- his probation officer.

20  Was it his bond --

21  A   It was his bondsman.

22  Q   His bondsman instead?

23  A   Yes, ma'am.

24  Q   Okay.  And so then, the bondsman didn't -- did not know

25  that he was living out of state?

Garman - Direct                                                    48

1  A    That's correct.

2  Q    And do you know what -- what the bond was in state court?

3  A    I do not know at this time.  I do have notes in his file,

4  that I don't have with me, because this case was initially

5  covered by Alison Scifres, who is not here today, so.

6  Q    Okay.  And so, just to point out the obvious here, what do

7  you understand about somebody's obligation to keep their

8  bondsman advised about where they are residing?

9  A    They are supposed to report to the bondsman at all --

10 anytime that they relocate.  And it's my understanding that

11 the bondsman has to be agreeable to that.

12 Q    Okay.  And if -- if you've got the information, because I

13 don't remember the date exactly, what information do you have

14 about the date upon which Mr. Gordon made bond in Mississippi

15 County?  And if you don't, that's okay.

16 A    I remember interviewing Mr. Gordon, and I remember him

17 stating that he had been in Iowa approximately around -- I

18 want to say it was a -- a summer month, I want to say it was

19 August approximately, so, and -- and he had said that at that

20 time he had made bond and then moved to Iowa.

21 Q    Okay.  And when did you speak to Mr. Gordon's bondsman?

22 A    That was October the 2nd -- October the 2nd of this year.

23 Q    All right.

24        MS. JEGLEY:  I'll pass the witness.

25                           CROSS EXAMINATION

1  BY MS. SULLIVAN:

2  Q   Officer Garman, are you aware that when Mr. Gordon bonded

3  out of Mississippi County, Mississippi County did not honor

4  the Marshals' detainer on him?

5  A   Yes, I became aware of that.  Yes, ma'am.

6  Q   And did he turn himself in, in this jurisdiction, or in

7  this court?

8  A   Yes, he did.  Yes, ma'am.

9  Q   Okay.  And we talked about the underlying charges a little

10 bit -- or you talked about them with Ms. Jegley.  What was

11 your information pertaining to his flight at the time of the

12 arrest on the case in which he's indicted on here?

13 A   According to the police report, it stated that -- that Mr.

14 Gordon and the unknown subject at that time both fled as

15 police approached them as they were standing beside the

16 vehicle.

17 Q   Did -- you said that there was -- the next day, they were

18 able to obtain a search warrant for the vehicle; is that

19 right?

20 A   Yes, ma'am.

21 Q   And that the -- there was a firearm found in the front

22 area of the vehicle?

23 A   Yes, ma'am.

24 Q   Did it say what front -- is that driver's side or

25 passenger's side; did it say?

1    A    It didn't say.  No, ma'am.

2    Q    Okay.  And I know we presented our potential third party

3    custodian to you, Ms. Anita Wilks, and she's the defendant's

4    grandmother; is that correct?

5    A    That's correct.

6    Q    Have you verified that she does not have any criminal

7    history?

8    A    Yes, ma'am.

9    Q    She has a stable residence?

10   A    That's correct.

11   Q    And at least says that she has no firearms in the home?

12   A    That is what she advised me.  Yes, ma'am.

13          MS. SULLIVAN:  I have no further questions.

14          THE COURT:  Okay.

15                         REDIRECT EXAMINATION

16   BY MS. JEGLEY:

17   Q    Mr. Garman, what information do you have about how long

18   the proposed third party custodian has lived in Iowa?

19   A    When I -- when I spoke with Ms. Wilks over the phone, she

20   had advised me that she recently moved there.  And I recall

21   her saying that she was in the process of moving during the

22   time that we had the last detention hearing --

23   Q    Okay.

24   A    -- here before this Court.

25   Q    Okay.  And did she offer to you why she moved to Iowa?

1  A    She -- she said that she had a son that lived there and

2  she wanted to be closer to her son.

3  Q    And do -- do we know whether or not that's Mr. Gordon's

4  father?

5  A    That is his father.  That's who she was referring to.

6           MS. JEGLEY:  And I believe that's all I have.  Thank

7  you.

8           THE COURT:  Ms. Sullivan?

9           MS. SULLIVAN:  Nothing further, Your Honor.

10           THE COURT:  Okay.  You may step down.  Thank you.

11      (Witness steps down.)

12           MS. JEGLEY:  Your Honor, I have no further evidence

13  to offer at this time.

14           THE COURT:  Thank you.

15           Ms. Sullivan, do you have any witnesses that you want

16  to call?

17           MS. SULLIVAN:  We do, Your Honor, but may I have a

18  moment to meet with Mr. Gordon?

19           THE COURT:  Yes.  Do you want to take a short recess?

20           MS. SULLIVAN:  If we could do that.

21           THE COURT:  Okay.  Why don't we take about ten

22  minutes.  Okay.  Court is in recess.

23      (Recess.)

24                         AFTER RECESS

25      (Call to Order of the Court at 11:36 a.m.)

1          THE COURT:  You may be seated.

2          Okay.  Ms. Sullivan?

3          MS. SULLIVAN:  Yes, Your Honor.  The defense calls

4    the defendant's grandmother, Anita Wilks.

5          THE COURT:  Okay.

6      ANITA WILKS, DEFENDANT'S WITNESS, SWORN.

7          THE COURT:  You may be seated right here, ma'am.

8                    DIRECT EXAMINATION

9    BY MS. SULLIVAN:

10   Q   Ms. Wilks, will you please introduce yourself to the

11   Court?

12   A   My name is Anita Jean Wilks.

13   Q   And how are you related to Mr. Gordon?

14   A   I'm his grandmother.

15   Q   Okay.  And how are you employed?

16   A   I'm sorry?

17   Q   How are you employed?

18   A   Oh, I'm a disabled veteran.

19   Q   Okay.  Where are you living?

20   A   At 1025 North -- North 10th Street in Burlington, Iowa.

21   Q   Did you just move there?

22   A   Yeah.

23   Q   And who lives with you?

24   A   My granddaughter, who is eight, and my brother temporarily

25   until he finds his self a job and an apartment of his own.

1    Q    Okay.  And did we contact you about serving as your

2    grandson's third party custodian?

3    A    Yes, ma'am, you did.  The day that I was moving, which was

4    the 3rd of October.

5    Q    And did you agree to let him live with you?

6    A    I did.

7    Q    And did you agree that if he is released, that you'll make

8    sure he does what he's supposed to do?

9    A    Yes, ma'am, I did.  I still do.

10   Q    Okay.  Are you aware of what he's charged with?

11   A    I'm aware of it, but.

12   Q    Are you aware that in federal court he's charged with

13   being a felon in possession of a firearm?

14   A    No.

15   Q    That that's why we're here on this charge?

16   A    Okay.

17   Q    And are you aware that he does face other charges in

18   Mississippi County?

19   A    Yes, ma'am.

20   Q    And those charges are burglary, kidnapping, theft of

21   property, battery, aggravated robbery; are you aware of those

22   charges?

23   A    Yes.

24   Q    Do you have any -- knowing that, do you have any problem

25   with him living with you?

1   A   I have no problem with him living with me.  He's my

2   grandson.

3   Q   Okay.  And would you have any problem notifying the Court

4   if he didn't comply with conditions?

5   A   No, ma'am, I would not have a problem with that at all.

6   Q   Okay.  Are you going to have rules in your house that he

7   has to follow?

8   A   I'm sorry?

9   Q   Will you have rules in your house that he has to follow?

10  A   Exactly.

11  Q   What would those be?

12  A   Regulations.  Be in when you're supposed to be in.  Don't

13  do what you're not supposed to do.  If I find out, you're out.

14  Q   Do you have a land telephone -- a telephone land line in

15  your home?

16  A   Yes, I do.

17  Q   Okay.  And so if he were released on electronic

18  monitoring, that wouldn't be a problem?

19  A   No, ma'am.

20  Q   Okay.  Do you live next door to his father?

21  A   I live right next door to him, yes, I do.

22  Q   Okay.  And is he supportive of his son, to your knowledge?

23  A   Is he what?

24  Q   Supportive?

25  A   Yes, ma'am.  He is supportive of him.  I mean, we just

1  want him to get back to where he was.

2  Q    Okay.  Where was -- what's that?

3  A    Which was being productive.  You know, he was a student.

4  He was a 3.6 GPA, you know, he went to college.  He's not --

5  he's not a -- a thug, you know, as people was -- I hear people

6  saying out the streets.  He's -- he's a good kid.  He just

7  went down the wrong path with some wrong people.

8  Q    Okay.  And do you think if he's in Iowa he'll -- he'll be

9  better off than being in Mississippi County?

10 A    I know he'll be better off, because where I used to live

11 at, he used to live at, and it's just a lot of -- a lot of

12 kids with nothing to do and always in trouble.

13 Q    And if he is in Iowa, does he have a job waiting for him?

14 A    Yes, ma'am.  He still has a job.  As a matter of fact, I

15 spoke to someone on that job a couple of weeks ago and they

16 said that they were still waiting for him to come back and

17 they were holding that job for him.

18 Q    And what is that job and where?

19 A    I'm not exactly sure what it's doing, but it is right

20 there in the city of Burlington.

21 Q    Okay.  And is it for Baker's Pride; is that the company?

22 A    They -- it's like -- it's changed names so many times.

23 Yeah, it's like where they make crackers, cookies.

24 Q    Okay.

25 A    That kind of stuff.

1  Q    Okay.

2          MS. SULLIVAN:  May I have one moment, Your Honor?

3          THE COURT:  Sure.

4          MS. SULLIVAN:  I have no further questions.

5          THE COURT:  Okay.

6          Ms. Jegley?

7          MS. JEGLEY:  Thank you, Your Honor.

8                        CROSS EXAMINATION

9  BY MS. JEGLEY:

10 Q    Ms. Wilks, first of all, let me thank you for your

11 service.

12 A    Thank you.

13 Q    How old is Mr. Gordon now?

14 A    How old is he?

15 Q    Uh-huh.

16 A    Forgive me if I can't tell you how old he is, because I

17 don't know -- I don't know the age of some of my own kids

18 right now because of all the stuff that I have been going

19 through.

20 Q    Okay.  Any kind of ballpark idea about how old he is?

21 A    21/22.

22 Q    Okay.  And how much contact have you had with -- let's see

23 here, let me look at this real quick.  All right.  So, it --

24 and I understand what you're talking about, sometimes I have

25 to think about how old my kids are, too.  But according to the

1  information Probation has here, he's now 23.

2  A    Okay.

3  Q    And so, what I'm interested in is how much contact you've

4  had with him over the last five years or so.

5  A    Over the last five years, I have had great contact with

6  him.  He stayed with me from time to time, you know, when I

7  lived right in the area where all this stuff was happening at.

8  I have a good, you know, relationship with his mom.  So, it

9  was like my house was always open to him.

10  Q    Okay.

11  A    Where he could come and go, you know, but there were rules

12  and there was regulations that he had to follow when he was

13  there at my house.

14  Q    Okay.  And where -- and where were you living at the time?

15  A    I was living at 212 South -- South Cedar Street in Luxora.

16  Q    Okay.  And so, I'm looking at the information that

17  Probation has here, and it looks like Mr. Gordon started

18  getting into trouble when he was 18, and he's had a number of

19  arrests that have continued during that time, for driving

20  under the influence, drug suspension, possession of drugs,

21  unsafe vehicle, defective equipment, theft of property, felon

22  in possession, and then the charges that he picked up in 2014

23  out of Mississippi County.  So, over this five year period,

24  were -- were -- while he's picked up these other charges, was

25  that a time frame within which he was having frequent contact

1  with you?

2  A    Yes, he had some contact with me in 2014.

3  Q    Okay.  But I'm -- I'm talking about here going back for

4  the last five years?

5  A    Okay.  When he was in college, I would check on him from

6  time to time then, when he was going to UCA.  Then he

7  transferred from UCA and he started going to the community

8  college in Blytheville.

9  Q    Okay.

10 A    So, I -- I've had great contact with him.  I'm not saying

11 he's an angel.  I mean, there's a lot of kids out there that

12 get in trouble.  But, you know, you can come back from that

13 trouble if you've got a support system there to help you, you

14 know, rehabilitate.  That's what the system is for, you know,

15 young adults get in trouble, then you're there to try and help

16 them, you know.  He's not a person that's always been in

17 trouble, you know, not to a point where it is right now.  He

18 -- he has not, you know, caused bodily harm to anybody or, you

19 know, when he was going to school, he wasn't doing that kind

20 of stuff.

21 Q    Okay.  And so you believe that he's not caused bodily harm

22 to anybody?

23 A    When he was going to school, he did not cause bodily harm

24 to anybody.  I mean, just within the last year is when I think

25 all the charges and stuff has been coming, you know, against

1  him.

2  Q   Okay.  And which -- do you remember which years he was

3  enrolled in college?

4  A   It's been a while.

5  Q   Okay.  And do you know how old he was when he dropped out?

6  A   He was 21 -- he might have been 21 when he dropped out.

7  Q   Okay.

8          MS. SULLIVAN:  I have nothing further.

9          THE COURT:  Thank you.

10          Anything else?

11          MS. SULLIVAN:  Nothing, Your Honor.

12          THE COURT:  Thank you, ma'am.  You may step down.

13          THE WITNESS:  Thank you.

14      (Witness steps down.)

15          MS. SULLIVAN:  We have no further witnesses, Your

16  Honor.

17          THE COURT:  Okay.  Thank you.

18          All right.  I'll give you guys an opportunity to make

19  your closing statement to me.

20          And then I may need to take a recess just to go back

21  over all the exhibits before I make a final decision.  Okay?

22          MS. JEGLEY:  Well, I have to say I feel a little bit

23  self-conscious here in arguing, because I don't want to take

24  -- I don't want to waste the Court's time.

25          But I -- I go back to the circumstances here

1   originally with Mr. Gordon.  And when he came in the first

2   time, I took his word that he was living with his father.

3   Everybody else associated with the court took his word, and

4   the Court relied on his word that he was living with his

5   father, only for us to find out that, in fact, he was not.

6          And then we have the information that Mr. Garman

7   provided to us today that Mr. -- Mr. Gordon's bond -- bondsman

8   in Mississippi County didn't know that he was living

9   elsewhere, living out of state.

10          And then we -- I -- I think we've got a very strong,

11  strong, case showing that Mr. Gordon has escalated over a

12  period of time and has picked up charges for the last five

13  years.

14          And I -- I believe that Ms. Wilks is well

15  intentioned.  I have -- I don't -- I have no doubt about that.

16  But I think she's not in a position, nor do I think anyone

17  else is in a position, to guarantee that Mr. Gordon will not

18  be a danger to the community.

19          And I think that the evidence that we've put on about

20  this incident -- I mean, he's -- what I see here is, is a

21  young man who has escalated, from the time of the underlying

22  charges in March of 2014, all the way up to we get into March

23  of 2015 and he's participating in a violent kidnapping.

24          And whether or not he cut the victim in this matter,

25  this is a disabled veteran, he's a large man from the

1  photographs, it's -- it looks to me, at any rate, as though it

2  would take two people to subdue him.

3       And then, looking at -- at all of the evidence, going

4  forward, and I'm not going to recap all of it, I think it's

5  pretty clear that this young man is unsupervisable and that he

6  poses a clear and convincing danger to the community.

7       I don't think he's supervisable.  And I'm asking that

8  the Court keep him detained until trial.

9       THE COURT:  Thank you.

10       Ms. Sullivan?

11       MS. SULLIVAN:  Your Honor, we are obviously asking

12  that he be released.

13       We believe that his grandmother is a suitable third

14  party custodian, that he can be placed on electronic

15  monitoring, and he will be employed in Iowa.

16       The pending charges in which most of the testimony

17  was about today, from Mississippi County, I believe that

18  Sergeant Bryce [sic] testified that there was no forensic

19  evidence linking Mr. Gordon to those offenses, but there was

20  with the other suspect, Terrell Harrell.  So there's -- he's

21  not been convicted of that.

22       And, in addition, he turned himself in on March 18th

23  of this year when he realized there was a warrant for him on

24  those charges.

25       He was, you know, supposed to be, I guess, federally

1  detained when Mississippi County -- I have no idea what

2  happened, but they let him out.  And he turned himself in

3  here.

4         And I realize that he was not entirely honest when he

5  appeared here initially, but I do believe that his grandmother

6  would make sure that he does what he needs to do and that he

7  stays out of trouble.

8         And I believe that there are a condition of

9  combination -- or a combination of conditions that can be

10 imposed that would ensure safety of the community and make

11 sure that he appears when he needs to appear.

12        So, for those reasons, we're asking that he be -- he

13 be released.

14        THE COURT:  Thank you.

15        If you guys will give me about 15 minutes to go back

16 over my notes and to go over the exhibits, then I'll come back

17 and issue my ruling.

18     (Recess.)

19                        AFTER RECESS

20     (Call to Order of the Court at 12:07 p.m.)

21        THE COURT:  You may be seated.

22        Okay.  I have had an opportunity to review my notes

23 from this morning's hearing, as well as all of the exhibits

24 that were offered into evidence by Ms. Jegley.

25        I am finding that Ms. Jegley has met her burden and

1  that Mr. Gordon is a danger to the community and I'm finding

2  that no conditions or grouping of conditions will reasonably

3  assure the Court that Mr. Gordon is going to not provide -- or

4  not be safe to the community.

5          So I'm going to find that Mr. Gordon needs to be

6  detained pending the trial of his case.

7          And also -- and I think that's all I need to do.  I'm

8  going to ask the Marshals to take him back into federal

9  custody, where he will remain detained until his trial.

10         And the Court will be in recess.

11     (Adjournment at 12:08 p.m.)

12            ELECTRONIC SOUND RECORDING CERTIFICATION:

13 I, court approved transcriber, certify that the foregoing is a

14 correct transcript from the official electronic sound

15 recording of the proceedings in the above-entitled matter.

16

17 /s/Robin Warbritton                 October 5, 2016
   Signature of Approved Transcriber   Date

18

19 Robin Warbritton
   Typed or Printed Name

20

21

22

23

24

25